IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

DRUMMOND COAL SALES, INC., )
)
    Plaintiff, )
)
vs. )
)   Case No. 7:16CV00489
NORFOLK SOUTHERN RAILWAY )
COMPANY, )
)
    Defendant. )

## COMPLAINT

Plaintiff, Drummond Coal Sales, Inc. ("DCS"), hereby files this Complaint against Defendant Norfolk Southern Railway Company ("Norfolk Southern"), and in support thereof states as follows:

### PARTIES

1.    Drummond Coal Sales, Inc. is an Alabama corporation with its principal place of business in Vestavia Hills, Alabama.

2.    Norfolk Southern is a Virginia corporation with its principal place of business in Norfolk, Virginia. Norfolk Southern is a freight railroad engaged in the transportation of raw materials, intermediate products, and finished goods primarily in the Southeastern, Eastern and Midwestern United States, including Alabama. On information and belief, Norfolk Southern operates a railroad

1

terminal in this district, has entered into agreements to transport products to, from, and through Alabama, and otherwise conducts significant commercial activity within the state of Alabama.

## JURISDICTION AND VENUE

3. This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. 1332 because the amount in controversy exceeds $75,000, exclusive of interests and costs, and it is between citizens of different states.

4. This Court has jurisdiction over this declaratory judgment action under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*

5. Venue is proper in this district under 28 U.S.C. § 1391(b)(1-2) because Norfolk Southern resides in this judicial district and because a substantial portion of the events or omissions giving rise to this claim occurred in this district. Norfolk Southern regularly conducts business in and is thus subject to jurisdiction in this district, the contract at issue was negotiated and executed, at least in part, in this district, and Norfolk Southern sent invoices for payment under the Contract to DCS in this district.

## FACTS

6. DCS is in the business of marketing and selling coal directly or through its affiliates. The coal is primarily mined in Colombia, South America by DCS's affiliate, Drummond Ltd.

7. On January 20, 2006, DCS and Norfolk Southern entered into a written contract the purpose of which was for Norfolk Southern to haul coal imported from Colombia to specified power plants in Georgia, North Carolina, South Carolina and Virginia. The contract was amended on January 12, 2010. The contract as amended is referred to herein as the "Contract." The Contract has a term which ends on December 31, 2019.[1]

8. Under Article 1 of the Contract, Norfolk Southern agreed to haul for DCS certain "Commodity" defined in the contract as "coal, coal blends, petroleum coke and/or coal-based synfuel." The Contract contemplates that Norfolk Southern will transport Commodity by rail from the Shipyard River Terminal in Charleston, South Carolina exclusively to 23 different "Destinations," all of which were existing and operating coal-fired power plants at the time the Contract was entered into. The Destinations are expressly listed in Appendices A-H of the Contract.

9. Norfolk Southern, however, does not guarantee that any amount of Commodity will actually be shipped under the Contract. In fact, the Contract contains a "Cancellation" clause which gives Norfolk Southern the sole discretion to cease rail service to any of the specified Destinations at any time, with no

---

[1] The Contract contains a "Confidentiality" provision, requiring the parties to use their best efforts to maintain the confidentiality of the Contract. Therefore, DCS is publicly filing a redacted version of this Complaint, and contemporaneously filing a motion for leave to file an unredacted version under seal with the Court.

remedy to DCS whatsoever. Furthermore, the Contract provides that Norfolk Southern will not provide rail cars for shipments to the vast majority of the Destinations, but rather such shipments must be made by private rail cars supplied at no cost to Norfolk Southern. But, Norfolk Southern retains the sole discretion as to whether it will permit such private rail cars to be placed on Norfolk Southern's tracks. No remedy is provided to DCS in the event Norfolk Southern refuses such permission.

10. Norfolk Southern enjoys enormous bargaining power with respect to coal shipments to the Destinations covered by the Contract. There are only two railroads that can deliver coal from the Charleston terminal to utilities in the surrounding area: Norfolk Southern and CSX. For more than half of the Destinations, Norfolk Southern is the only rail carrier that has a track to the Destination, making these Destinations "captive" plants of Norfolk Southern.

11. Furthermore, rail carriers often enter into contracts with utilities whereby the utilities are required to ship virtually all (90-95%) of their coal with that rail carrier. Thus, although there may be more than one rail line into a particular power plant, the plant essentially becomes "captive" to the rail carrier via contract. Upon information and belief, Norfolk Southern held contracts which made certain of the Destinations essentially "captive" to Norfolk Southern during the relevant time period.

4

12. As a result, Norfolk Southern held monopoly power over rail shipments to a majority of the Destinations, and at least oligopoly power over rail shipments to all of the Destinations.

13. As stated Article 20(a), as amended, DCS was required to, and did in fact, pay for certain capital improvements to Norfolk Southern's rail lines, at a total cost of $ ███████. Pursuant to Articles 20(b) and (c), as amended, Norfolk Southern was to compensate DCS for this expenditure by paying a specified amount per net ton of Commodity that Norfolk Southern shipped from the Charleston terminal to any location, regardless of whether it was shipped for DCS or any other customer of Norfolk Southern.

14. Norfolk Southern has not paid DCS for a single ton of Commodity shipped from the Charleston terminal in 2011, or any year thereafter. Upon information and belief, the improvements paid for by DCS have allowed Norfolk Southern to increase its capacity for all shipments, and Norfolk Southern has not had to repay DCS for the full cost of that increased capacity.

15. Under Article 27 of the Contract, DCS was also required to ship guaranteed volumes of Commodity ("Guaranteed Volumes") each year from Charleston Terminal to the Destinations specified in Appendices A-H. Beginning with the calendar year 2010 and each calendar year thereafter through December 31, 2019, the Guaranteed Volume was ███████ net tons of Commodity per year.

16. Article 27 of the Contract further provides that if DCS fails to satisfy the Guaranteed Volume requirement for a calendar year, then within 30 days after receiving an invoice from Norfolk Southern, DCS is to pay Norfolk Southern a specified amount per net ton (subject to yearly adjustment) multiplied by the tonnage shortfall (the "Shortfall Fee").

17. Since 2010, the Environmental Protection Agency (EPA) and various other government agencies have proposed and implemented stringent environmental rules and regulations that greatly impacted the consumption of coal by power plants and other end users in the United States.

18. Indeed, since 2010, approximately 40% of the coal-fired power plants in this country have been retired. In the past 19 months Norfolk Southern has removed from service 300 miles of rail lines due to decreased coal shipments.

19. Governmental regulation of coal-fired power plants has had a particularly severe impact on the power plants identified by the parties in the Contract. More than half of the 23 Destinations identified in Appendices A-H have either closed completely or no longer burn coal. Those Destination power plants still in operation have substantially reduced their use of coal as a fuel source.

20. Furthermore, due to these environmental regulations, the market for imported coal in the relevant area, which was the entire purpose of the Contract, has essentially ceased to exist. Indeed, Norfolk Southern's website lists the ports

serviced by its rail lines, and the Charleston terminal is not even listed. As stated above, unless Norfolk Southern has breached it refund obligations under Article 20 of the Contract, Norfolk Southern has not shipped a single ton of Commodity from the Charleston terminal to any location in 2011 or any year thereafter. If, on the other hand, discovery proves that Norfolk Southern *has* shipped any Commodity from the Charleston terminal between 2011 and the present, this Complaint will require amendment as it will mean Norfolk Southern has breached its obligations without DCS's knowledge.

21. Article 27 of the Contract provides that if DCS notifies Norfolk Southern that it anticipates not being able to ship the Guaranteed Volume during any particular year, the parties are to work together in good faith to find alternatives which would allow DCS to meet the Guaranteed Volume.

22. In August of each year DCS has given Norfolk Southern its Annual Forecast of tons DCS expects to ship in the following year. Since 2011, that Annual Forecast has been zero.

23. Despite being provided notice that DCS did not anticipate being able to ship the Guaranteed Volume in 2011, 2012, 2013, 2014, or 2015, Norfolk Southern did not offer any alternatives to DCS which would allow DCS to meet the Guaranteed Volume. Instead, Norfolk Southern merely sent invoices for the Shortfall Fee after the end of each of those years.

24. Not only has Norfolk Southern failed to work with DCS in an attempt to assist DCS in meeting the Guaranteed Volume, Norfolk Southern has incentive to work against DCS by shipping coal to the Destinations (at least those which still take coal) from DCS's competitors. Upon information and belief, Norfolk Southern has contracts with the Destination utilities (such as Georgia Power, Duke Power, and Progress Energy) requiring those utilities to ship guaranteed minimum amounts of coal with Norfolk Southern. By fulfilling those utilities' minimums with coal from DCS's competitors, Norfolk Southern does not have to credit that coal to the Contract resulting in a double benefit to Norfolk Southern. First, Norfolk Southern does not have to repay DCS for the infrastructure improvements at the specified refund amount per ton shipped, and second, DCS's Guaranteed Volume is not reduced thereby resulting in Shortfall Fees.

25. Furthermore, upon information and belief, Norfolk Southern has not done its part during the term of the Contract to ensure it could deliver coal to all of the Destinations or notify DCS of the impracticability of doing so. Upon information and belief, during the term of the Contract, CSX obtained contracts with some of the Destinations (and/or the utilities that operated them) whereby those Destinations became essentially "captive" by contract to CSX, as described in Paragraph 11, above. As a result, those Destinations could not, as a practical matter, take DCS coal shipped by Norfolk Southern as it would cause those

8

Destinations to breach their contracts with CSX. Norfolk Southern did not inform DCS at any time of the fact that it would virtually impossible for Norfolk Southern to deliver coal to certain of the Destinations.

26. Additionally, upon information and belief, Norfolk Southern has received force majeure notices from the utilities referred to as "Consignees" in the Contract, impacting those Consignees' ability to take coal, but has not informed DCS of these force majeure notices and has not reduced DCS's Guaranteed Volume as a result. Article 29(a) provides as an example of an event of force majeure "any Force Majeure Event with respect to . . . a Consignee," and Article 29(c) states that in the event of such a Force Majeure Event, "the Guaranteed Volume . . . shall be adjusted if and to the extent warranted by such Force Majeure Event."

27. Norfolk Southern shipped no tons of Commodity under the Contract in the years 2011, 2012, 2013, or 2014. Nevertheless, DCS has paid Norfolk Southern's invoices each year for the Shortfall Fee: $■■■ for 2011, $■■■ for 2012, $■■■ for 2013, and $■■■ for 2014. In other words, since 2011, Norfolk Southern has been paid $■■■ for doing nothing.

28. Norfolk Southern also shipped no tons of Commodity under the Contract in 2015. On January 6, 2016, Norfolk Southern submitted to DCS an invoice for the 2015 Shortfall Fee in the amount of $■■■

9

29. Upon information and belief, between 2011 and the present, Norfolk Southern has not reserved capacity or made any specific plans to ensure it would be able to service the Contract if called upon to do so.

30. In fact, the Contract does not require Norfolk Southern to do anything more than what it is already legally obligated to do under its common carrier obligations. Article 11 of the Contract specifically provides that "NS shall have the same obligations with respect to rail service hereunder as if transportation services under this Contract were regulated under the terms of the Interstate Commerce Act."

## COUNT ONE
### Declaratory Relief – Declaration that the Contract is Void

31. DCS realleges and incorporates by reference the allegations contained in paragraphs 1 through 30 as if set forth fully herein.

32. As set forth above, Norfolk Southern enjoys monopolistic bargaining power with respect to most of the Destinations covered by the Contract, and at least oligolopolistic power with respect to the remainder.

33. While the Contract requires DCS to do numerous things—including paying close to $[REDACTED] for capital improvements to Norfolk Southern's rail system and paying more than $[REDACTED] per year for services that DCS does not use—it does not bind Norfolk Southern to do anything but live up to its legally required common carrier obligations.

10

34. In fact, as explained above in Paragraph 9, Norfolk Southern retains the sole discretion to cease service to all of the Contract Destinations, with no remedy provided to DCS in such event.

35. Furthermore, Norfolk Southern included in the Contract rate escalators, which are intended in part to cover costs of fuel, as well as a fuel surcharge. This practice of "double dipping" was condemned as an unreasonable practice by the Surface Transportation Board, which prohibited railroads from engaging in this practice in 2007. Nevertheless, when the Contract was amended in 2010, Norfolk Southern kept this illegal term in the contract. There is no provision in the Contract whereby the parties expressed an intent that illegal or otherwise void provisions of the Contract could be severed from the whole. This provision makes the Contract void as illegal and/or contrary to public policy.

36. The Contract also contains provisions that are highly unusual, if not unheard of, in coal shipping contracts. For example, the Contract makes DCS responsible for train demurrage both at the Origin and at the Destination. As another example, the Contract relieves Norfolk Southern from offering to DCS any rail cars to the vast majority of the Destinations not only during the term of the Contract, but also for two years after the Contract is terminated.

11

37. But due to Norfolk Southern's virtually monopolistic bargaining power, if DCS wished to ship to the Contract Destinations DCS had little choice but to accept whatever terms Norfolk Southern insisted upon.

38. DCS respectfully requests that this Court declare

    a. That the Contract is unconscionable and therefore void;

    b. That the provisions allowing "double dipping" through rate escalations and fuel surcharges are illegal and/or against public policy, thereby rendering the Contract void;

    c. That the Shortfall Fees constitute an unenforceable penalty;

    d. That the Contract lacks mutuality of obligation, and is therefore void;

    e. That the Contract lacks consideration, and is therefore void;

    f. That DCS is entitled to restitution of the amounts paid under the Contract from 2011 to the present in the amount of $[REDACTED] plus any legally applicable interest, as well as the $[REDACTED] that has not been refunded to DCS for the infrastructure improvements to Norfolk Southern's rail lines funded by DCS; and

    g. That DCS has no further obligations under the Contract.

## COUNT TWO
### Money Had and Received and/or Unjust Enrichment

39. DCS realleges and incorporates by reference the allegations contained in paragraphs 1 through 37 as if set forth fully herein.

40. As set forth above, DCS requests that the Contract be declared void.

41. Norfolk Southern would be unjustly enriched if it were permitted to retain the $[REDACTED] it has been paid since 2011 under this void Contract.

42. Furthermore, Norfolk Southern has reaped the benefit of the infrastructure improvements paid for by DCS for many years, and will continue to enjoy the benefits of those improvements in the future. Norfolk Southern has not repaid DCS for $[REDACTED] of the amount DCS paid for those improvements.

43. DCS therefore requests, under the doctrines of unjust enrichment and/or money had and received, that Norfolk Southern be required to repay to DCS:

   a. The $[REDACTED] it has paid since 2011 under the Contract, plus any legally applicable interest; and

   b. The $[REDACTED] it has yet to be refunded for the infrastructure improvements to Norfolk Southern's rail lines.

## COUNT THREE
### Declaratory Relief – Excused Performance Due to Norfolk Southern's Breach

44. DCS realleges and incorporates by reference the allegations contained in paragraphs 1 through 37 as if set forth fully herein.

45. Under the Contract, if Norfolk Southern receives notice from DCS that it anticipates not being able to ship the Guaranteed Volume, Norfolk Southern is required to work with DCS in good faith to find alternatives that would allow DCS to meet the Guaranteed Volume and avoid Shortfall Fees.

46. DCS notified Norfolk Southern in advance of calendar years 2011, 2012, 2013, and 2014 not only that it did not anticipate meeting the Guaranteed Volume, but that DCS did not anticipate shipping any coal under the Contract for those years.

47. Norfolk Southern did not make any offers or any other good faith efforts to assist DCS in meeting its Guaranteed Volume obligations.

48. On August 28, 2014, DCS notified Norfolk Southern that it did not anticipate shipping any tons of coal under the Contract for the year 2015.

49. Consistent with past practice, Norfolk Southern did not make any offers or any other good faith efforts to assist DCS in meeting its Guaranteed Volume obligations for 2015. Nevertheless, Norfolk Southern sent DCS an invoice on January 6, 2016 in the amount of $[REDACTED] for the 2015 Shortfall Fees.

14

50. DCS respectfully requests that this Court declare

   a. That DCS is not required to satisfy the Guaranteed Volume requirements or pay a Shortfall Fee for calendar year 2015 due to Norfolk Southern's breach of its obligation to work with DCS in good faith to find alternatives which would allow DCS to satisfy its Guaranteed Volume obligations and thereby avoid Shortfall Fees; and/or

   b. That Norfolk Southern has breached is obligation of good faith and fair dealing and DCS is therefore not required to satisfy the Guaranteed Volume requirements or pay a Shortfall Fee for calendar year 2015.

## COUNT FOUR
### Declaratory Relief – Force Majeure

51. DCS realleges and incorporates by reference the allegations contained in paragraphs 1 through 37 as if set forth fully herein.

52. Article 29 of the Contract contains a "Force Majeure" provision, which provides that "[n]either party shall be liable for any delay or nonperformance when any of the foregoing is caused in whole or in part by any cause not within the control of said party, whether now or hereafter existing (a 'Force Majeure Event')." The Contract also provides that in the event of Force Majeure, the Guaranteed Volume shall be adjusted accordingly.

53. Government environmental regulations implemented subsequent to the making of the Contract caused the power plants specified in Appendices A-H of the Contract to substantially reduce or eliminate their use of coal. These power plants were the specific Destinations to which coal was to be shipped under the Contract. These power plants' substantial reduction or elimination of their use of coal are circumstances beyond DCS's control, and constitute "force majeure events" within the meaning of the Contract.

54. As a result of the force majeure events, DCS is unable to meet the Guaranteed Volume obligations under the Contract.

55. DCS has provided Norfolk Southern with notice of its declaration of force majeure.

56. DCS respectfully requests that this Court declare

   a. That DCS is not liable for satisfying the 2015 Shortfall Fees because its inability to meet the Guaranteed Volume shipping requirements was caused by force majeure events; and

   b. That DCS is not liable for any further performance under the Contract due to the existence of force majeure events.

## COUNT FIVE
### Declaratory Relief – Frustration of Purpose

57. DCS realleges and incorporates by reference the allegations contained in paragraphs 1 through 37 as if set forth fully herein.

58. Norfolk Southern's promise to haul coal from the Charleston terminal to the Destinations specified in the Contract at certain rates has become virtually worthless to DCS.

59. DCS's principal purpose in entering into the Contract was to secure rail transportation for its import coal from the Charleston Shipyard River Terminal to be delivered to the specific power plants identified in Appendices A-H to the Contract.

60. The power plants' substantial reduction or elimination of their use of coal, and imported coal in particular, due to environmental regulations, and not because of any fault of DCS, has substantially frustrated DCS's principal purpose in making the Contract.

61. It was a basic assumption of the Contract that the specified power plants would continue to operate and require shipments of coal, and that they would not close or substantially reduce their use of coal, and their use of imported coal in particular, during the term of the Contract.

62. In fact, Norfolk Southern knows, or reasonably should know, that the purpose of the Contract has been frustrated. Unless it has breached the refund provisions of the Contract, Norfolk Southern has not shipped a single ton of Commodity from the Charleston terminal (whether from DCS or any other source)

in the last five years. Norfolk Southern does not even list the Charleston terminal on its website as one of the terminals served by Norfolk Southern.

63. DCS requests that this Court declare that it is not required to satisfy the Guaranteed Volume requirements or pay a Shortfall Fee for calendar year 2015 or for the remaining Term of the Contract because DCS's principal purpose in entering into the Contract has been substantially frustrated due to circumstances beyond its control.

## COUNT SIX
### Declaratory Relief – Impossibility/Impracticability of Performance

64. DCS realleges and incorporates by reference the allegations contained in paragraphs 1 through 37 and 57 through 61 as if set forth fully herein.

65. It has become commercially impracticable for DCS to meet its Guaranteed Volume obligations to the destinations specified in the Contract because those power plants have either closed or substantially reduced their use of coal, and their use of imported coal in particular.

66. The plants' decisions to close or substantially reduce their use of coal, and their use of imported coal in particular, are not because of any fault of DCS and are beyond DCS's control.

67. DCS requests that this Court declare that it is not required to satisfy the Guaranteed Volume requirements or pay a Shortfall Fee for calendar year 2015 or for the remaining Term of the Contract because it would be impracticable for

DCS to comply with its Guaranteed Volume obligations due to supervening events beyond its control, the non-occurrence of which were a basic assumption of the Contract.

## COUNT SEVEN
### Rescission, Modification or Reformation

68. DCS realleges and incorporates by reference the allegations contained in paragraphs 1 through 66 as if set forth fully herein.

69. To the extent the Court declares in DCS's favor, in whole or in part, as set forth above, DCS requests that the Court rescind the Contract, or in the alternative, modify or reform it to account for the changed circumstances which have occurred since 2010.

## JURY DEMAND

**DRUMMOND COAL SALES, INC. DEMANDS TRIAL BY JURY ON ALL OF THE ISSUES TRIABLE BY A JURY IN THE COMPLAINT**

Respectfully Submitted,

s/ William A. Davis, III
William A. Davis, III (ASB-5657-D65W)
H. Thomas Wells, III (ASB-4318-H62W)
STARNES DAVIS FLORIE LLP
P.O. Box 59812
Birmingham, AL 35259
(205) 868-6000
Fax: (205) 868-6099

*Attorneys for Plaintiff Drummond Coal Sales, Inc.*

19