CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

AUG 2 2 2018

JULIA C. DUDLEY, CLERK
BY: A. Beeson
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | |
|---|---|
| DRUMMOND COAL SALES, INC., ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 7:16cv00489 |
| ) | |
| v. ) | |
| ) | By: Michael F. Urbanski |
| NORFOLK SOUTHERN RAILWAY ) | Chief United States District Judge |
| COMPANY, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

This is the second time the court has been called upon to resolve a dispute between these two parties arising out of a 2006 contract for rail transportation services from a terminal in Charleston, South Carolina to 23 specified coal-burning power plants in the southeastern United States. The parties resolved their initial dispute in 2010, agreeing to amend certain provisions of the contract and extend its term. Plaintiff Drummond Coal Sales, Inc. now seeks a declaration that its performance under the contract, as amended, should be excused.

Drummond's theory of this case from the outset has been that the market for imported coal at the majority of the 23 contractually-designated destinations has ceased to exist. As a result, it has been unable to meet its minimum volume obligations under the parties' contract. In the course of discovery, Drummond's theory shifted. The current thrust of Drummond's argument is that defendant Norfolk Southern Railway Company entered into confidential third-party contracts with the destination power plants, requiring the destinations to ship minimum volumes of coal under their contracts or pay shortfall fees.

Drummond contends these third-party contracts prevent the destinations from taking coal on Drummond's contract and deprive Drummond of the benefit of the bargain it struck with Norfolk Southern.

For its part, Norfolk Southern contends this is simply a case of buyer's remorse. Norfolk Southern asserts Drummond was well aware at the time the contract was executed and later amended that environmental regulations looming on the horizon could affect the market for coal in the southeastern United States. Drummond also was aware that Norfolk Southern had separate, confidential transportation contracts with the destination utilities. Norfolk Southern insists that Drummond, a sophisticated party, understood and accepted the risks inherent in this contract, requiring it to ship certain volumes of coal or pay a shortfall fee. As such, Drummond should not be excused from performing because the deal did not turn out as it had hoped.

There is no dispute that since 2011, Drummond has shipped no coal under the parties' contract. Nor is there any dispute that Drummond has paid Norfolk Southern millions of dollars in annual shortfall fees as a result. What is in dispute, however, is why Drummond fails to meet its minimum volume requirements year after year. And as to their views on that issue, these parties are like two trains passing in the night.

As detailed below, the particular factual circumstances at play in this case lead the court to conclude that the breach of contract claims alleged in Count One must be resolved by a finder of fact. Accordingly, the court will **DENY** the cross motions for summary judgment (ECF Nos. 122 & 123) as to the first count of the amended complaint. The court

also will **DENY** Norfolk Southern's motion (ECF No. 122) as to Count Six, alleging rescission, modification, or reformation of the contract, to the extent it relies on Count One.

The remaining counts of the amended complaint fail as a matter of law. Drummond cannot maintain a cause of action against Norfolk Southern for unjust enrichment (Count Two) given the express, valid contract governing the subject matter at issue. And, as explained below, Drummond's defenses of force majeure (Count Three), frustration of purpose (Count Four), or impossibility / impracticability of performance (Count Five) cannot survive summary judgment. As such, the court will **GRANT** Norfolk Southern's motion (ECF No. 122) as to these four counts, as well as to Count Six to the extent it relies on Counts Two through Five.

## I.

Drummond is in the business of marketing and selling Colombian coal. Norfolk Southern is a freight railroad engaged in the transportation of goods and materials in the southeastern, eastern and midwestern United States.

## A.

On January 20, 2006, Norfolk Southern and Drummond entered into a contract ("C-9337") for the transportation of coal and coal products from the Shipyard River Terminal ("SRT") in Charleston, South Carolina to 23 coal-fired power plants (the "Destinations") in the southeastern United States. This contract between a coal supplier and a rail carrier is unique in the industry. C-9337 does not guarantee the sale or shipment of any amount of commodity; rather, Drummond is required to market and successfully sell its coal to the utility Destinations. The end price of that coal, paid by the utility, consists of two

component parts—the price of the coal itself (set by Drummond, the coal supplier) and the cost to transport it. Typically, utility customers enter into confidential transportation contracts with rail carriers, leaving coal suppliers like Drummond in the dark as to what the utilities' transportation costs are. By entering into its own transportation contract, C-9337, Drummond purchased a schedule of calculable, guaranteed rates that it could use to price and sell its coal to the utilities in this market.

To that end, Article 13 of C-9337 provides for base transportation rates for each net ton of commodity shipped by Drummond from SRT on Norfolk Southern rail lines to the 23 Destinations. These rates, based on the specific Destination and shipment characteristics, are set forth in detail in Appendices A-H of the parties' contract.

Pursuant to Article 27, Drummond is required to ship a minimum volume of coal each year of the contract term from SRT to one or more of the 23 Destinations on Norfolk Southern's rail lines. Drummond may ship this guaranteed volume pursuant to C-9337 or any third-party contract. If it fails to ship the guaranteed volume in any given year, Drummond must pay Norfolk Southern a shortfall fee. Article 27(i) further provides that if Drummond notifies Norfolk Southern that it anticipates not being able to ship the guaranteed volume from SRT to the Destinations, the parties shall work together in good faith to identify and implement sales and transport alternatives that will permit Drummond to satisfy its guaranteed volume obligations.

Also relevant to this dispute is Article 20, which provides that Norfolk Southern must pay Drummond certain refunds for the cost of improvements made to rail infrastructure in

4

South Carolina. These refunds are calculated on a per net ton basis of commodity shipped from SRT by Norfolk Southern, regardless of whether it is shipped by Drummond.

C-9337 also contains a force majeure provision, Article 29, which provides that neither party shall be liable for any delay or nonperformance caused in whole or in part by any cause not within the control of said party, including without limitation:

> any act of God or of a public enemy or terrorist act, wars, rebellions, labor troubles, strikes, lockouts, riots, embargoes, blockades or interventions or expropriations by government or governmental authorities, interference by civil, military or governmental authorities, other civil unrest, failure or delay of manufacturers, suppliers or other third parties to deliver machinery or equipment or otherwise to perform, or any Force Majeure Event with respect to Kinder Morgan or a Consignee.

The original term of C-9337 was ten years, from 2006 to 2016. In April 2006, Drummond declared a force majeure event pursuant to Article 29 of the contract, citing Kinder Morgan's[1] failure to expand the port capacity at SRT. Norfolk Southern sued Drummond for breach of contract, which action subsequently was resolved by the parties at a settlement conference conducted by the undersigned, then a United States Magistrate Judge. See Norfolk Southern Railway Company v. Drummond Coal Sales, Inc., Case No. 7:08cv00340. The parties entered into a settlement agreement and executed a mutual release. The settlement agreement contemplated an amendment to C-9337, which extended the contract term through 2019 but reduced the guaranteed volume requirement set forth in Article 27 and adjusted the terms of the infrastructure refund set forth in Article 20.[2] All other provisions of C-9337 were to remain in full force and effect. Amendment Number 1

---

[1] Kinder Morgan owns the Shipyard River Terminal in Charleston, South Carolina.
[2] The amendment to C-9337 further provided that failure to expand the physical size and throughput capacity of SRT, regardless of the reason for such failure, shall not constitute a force majeure event under the contract pursuant to Article 29.

5

to C-9337 was executed on January 12, 2010. One week later, Case No. 7:08cv00340 was dismissed from the docket of this court.

## B.

In January 2016, Drummond brought suit on the contract, as amended, in the Northern District of Alabama. Norfolk Southern filed a motion to transfer venue to the Western District of Virginia in the Alabama case, and simultaneously filed a motion to reopen the case, assign the matter to the undersigned, and enforce the settlement agreement and mutual release in this district's Case No. 7:08cv00340. In an opinion entered August 29, 2016 in Case No. 7:08cv000340, the court held that Counts One and Two of Drummond's Alabama complaint were barred by the parties' mutual release but Counts Three through Seven were not. The remaining counts of Drummond's Alabama complaint thereafter were transferred to this district. Drummond subsequently amended its complaint to allege the following six claims:

- Count One: Declaratory Relief – Excused Performance Due to Norfolk Southern's Breach
- Count Two: Money Had and Received and/or Unjust Enrichment
- Count Three: Declaratory Relief – Force Majeure
- Count Four: Declaratory Relief – Frustration of Purpose
- Count Five: Impossibility / Impracticability of Performance
- Count Six: Rescission, Modification or Reformation

## C.

Two factual narratives come together to form the basis for Drummond's amended complaint. Setting the scene for the majority of Drummond's claims, Counts Three through Five, is the current state of the coal market in the relevant area. Drummond contends that since the contract was amended in 2010, the demand for coal at the 23 contractually-

6

designated Destinations has declined dramatically. See Schwartz Expert Report, ECF No. 128-2, at 3. Specifically, 12 of the 23 Destinations identified in C-9337 retired between 2012 and 2015 due to the Mercury and Air Toxics Standard ("MATS"), which went into effect in 2012. Id. at 4-5. The remaining 11 Destinations continue to burn coal, but much less of it, due to the increased availability and lower price of natural gas. Id. at 6. Additionally, these Destinations have begun to source high-sulfur, lower-cost coal from the Northern Appalachian region and the Illinois Basin, rather than the low-sulfur coal Drummond imports from Colombia.[3] Id. at 11.

Norfolk Southern generally does not disagree with these facts. It acknowledges the demand for coal among the Destinations has decreased. But it maintains that Drummond was aware of the changing market at the time the parties executed the amended contract in 2010—specifically, the shift away from low-sulfur coal, the declining cost of natural gas, and the environmental regulations on the horizon. See Steul Dep., ECF No. 132-2, at 83-85, 89-96, 98, 118-120, 122, 124; Drummond R. 30(b)(6) Dep., ECF No. 132-6, at 120, 130-40. Additionally, Norfolk Southern offers evidence that the remaining coal-fired power plants continue to solicit bids for coal delivery, and that the demand for coal at these utilities since 2010 far exceeds Drummond's annual guaranteed volume requirements. See ECF No. 132-17. According to Norfolk Southern, the reason these plants do not buy coal from Drummond is simply a matter of economics—the price is cheaper elsewhere. See Steul Dep.,

---

[3] The advent of MATS required coal-fired power plants to have some type of scrubbing technology to reduce hydrogen chloride emissions. Newer, larger plants already had scrubbers in place to remove sulfur dioxide in order to comply with earlier environmental regulations. Older, smaller plants that did not have scrubbers had been purchasing low-sulfur coal to satisfy these emissions standards pre-MATS. Because the cost of retrofitting an existing coal-fired plant with a scrubber was high, the plants without scrubbers declined to make such capital improvements and instead retired in response to MATS. The remaining plants, which had scrubbers, now have less of a need for low-sulfur coal to comply with environmental regulations. Schwartz Expert Report, ECF No. 128-2, at 4-5.

7

ECF No. 132-2, at 166-67; Drummond R. 30(b)(6) Dep., ECF No. 132-6, at 54-55, 120, 142-43.

Nevertheless, Drummond posits that it was a basic assumption of the contract that more than half of the 23 Destinations would not close or stop burning coal during the contractual period. Drummond alleges three related but legally distinct concepts—force majeure (Count Three), frustration of purpose (Count Four), and impossibility / impracticability of performance (Count Five)—in an effort to excuse its performance based on these market changes.

But there is more. Not only did half of the 23 Destinations stop burning coal or close after 2010—of the remaining 11 Destinations that still burn coal, 8 have separate, confidential transportation contracts with Norfolk Southern that preclude them from taking coal on C-9337 without incurring liquidated damages.[4] Transportation contracts between utilities and rail carriers are common in the industry. See Steul Dep., ECF No. 132-2, at 82-83. Similar to C-9337, these third-party contracts set transportation rates for coal shipped to utilities from certain origins.[5] Also like C-9337, these contracts contain guaranteed volume requirements and provide for liquidated damages should the volume commitments not be met. Some volume requirements are as high as 95%— meaning a utility would have to ship 95% of the coal it receives pursuant to that utility's transportation contract with Norfolk

---

[4] It should be noted that it is not only these eight Destinations that have separate, confidential transportation contracts with Norfolk Southern.

[5] The third-party contracts between the Destinations and Norfolk Southern were executed at various points in time, and some have been amended during the relevant period. All of these third-party contracts overlap the relevant term of C-9337 in some respect.

8

Southern.[6] According to Drummond, this renders the rates in its own transportation contract, C-9337, worthless.

All of these third-party utility contracts contain confidentiality provisions. Thus, while Drummond may have been aware of their existence at the time it executed and amended C-9337, it was not aware of their terms. See McClellan Dep., ECF No. 132-8, at 47; Steul Dep., ECF No. 132-2, at 82; Drummond R. 30(b)(6) Dep., ECF No. 132-6, at 93-94.

SRT is a designated origin in some (but not all) of the third-party contracts. As Norfolk Southern points out, C-9337 expressly allows Drummond to meet its minimum volume requirements by shipping from SRT to the Destinations pursuant to C-9337 "and/or any Third Party Contract(s)." Thus, conceivably, Drummond could meet its guaranteed volume commitments by shipping coal from SRT on the utilities' transportation contracts.

However, Drummond always was able to ship coal on the utilities' contracts. The entire purpose of entering into its own transportation contract with Norfolk Southern, C-9337, was to guarantee a schedule of rates for a duration of time that Drummond could use to sell and ship coal to the Destinations. Norfolk Southern R. 30(b)(6) Dep., ECF No. 110-1, at 78-79; see also Hamilton Dep., ECF No. 132-9, at 47-48 ("From the beginning . . . the statements were that Drummond would help NS, NS would help Drummond, Drummond would help us get into markets where we hadn't served before and, likewise, we would help them get into markets where they hadn't served before."). Necessarily implied in that contract is Drummond's ability to actually use those rates. Drummond bargained for an

---

[6] While one might argue that Drummond could satisfy its guaranteed volume requirements under C-9337 by shipping the 5% difference to these Destinations, Drummond insists this is impractical, as utilities do not buy coal in piecemeal. According to Drummond, 95% might as well be 100%. Tr. of Apr. 13, 2018 Hrg., ECF No. 173, at 36-38; see also Zehringer Dep., ECF No. 128-6, at 114.

9

opportunity to use these specific rates to try to sell into this market. Drummond alleges this opportunity was foreclosed by Norfolk Southern's double dealing.

Thus, not only did half of the 23 Destinations identified in C-9337 stop burning coal or close after 2010, but the remaining coal-fired plants had their own minimum volume obligations to Norfolk Southern, decimating the value of C-9337 to Drummond. This forms the basis for Count One of Drummond's amended complaint, alleging excused performance due to Norfolk Southern's prior material breach of contract.[7]

### D.

The parties have filed cross motions for summary judgment. Norfolk Southern moves for judgment in its favor as to all six claims. Drummond moves for summary judgment as to Count One only—specifically, its allegation that Norfolk Southern breached C-9337 by entering into separate, confidential third-party contracts that deprived Drummond of the benefit of its bargain. The issues have been fully briefed and argued, and this matter is ripe for adjudication.

### II.

Pursuant to Federal Rule of Civil Procedure 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any]

---

[7] Count One also alleges Norfolk Southern breached the contract by failing to work with Drummond in good faith to meet annual minimum volume requirements pursuant to Article 27, and by failing to pay infrastructure refunds due Drummond in a timely fashion, as required by Article 20.

affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. See Celotex, 477 U.S. at 323. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party. Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" McAirlaids, Inc. v. Kimberly–Clark Corp., No. 13-2044, 2014 WL 2871492, at *1 (4th Cir. June 25, 2014) (internal alteration omitted) (citing Tolan v. Cotton, 134 S. Ct. 1861, 1863 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." Anderson, 477 U.S. at 255. However, the non-moving party "must set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" Glynn, 710 F.3d at 213 (quoting Anderson, 477 U.S. at 252). Instead, the non-moving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for

11

that party." Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir.

2005) (quoting Anderson, 477 U.S. at 249). "In other words, to grant summary judgment the

[c]ourt must determine that no reasonable jury could find for the nonmoving party on the

evidence before it." Moss v. Parks Corp., 985 F.2d 736, 738 (4th Cir. 1993) (citing Perini

Corp. v. Perini Const., Inc., 915 F.2d 121, 124 (4th Cir. 1990)).

## III.

The parties have filed cross motions for summary judgment as to Count One,

alleging excused performance due to Norfolk Southern's prior material breach of contract.

"Generally, a party who commits the first breach of a contract is not entitled to enforce the

contract." Horton v. Horton, 254 Va. 111, 115–16, 487 S.E.2d 200, 203–04 (1997) (citations

omitted).[8] Such breach, if material, excuses the non-breaching party from performance. Id. at

116, 487 S.E.2d at 204. "A material breach is a failure to do something that is so

fundamental to the contract that the failure to perform that obligation defeats an essential

purpose of the contract." Id. at 115, 487 S.E.2d at 204 (citations omitted). While a specific

amount of monetary damages flowing from the breach can serve as evidence of a material

breach, proof of damages is not essential "when the evidence establishes that the breach was

so central to the parties' agreement that it defeated an essential purpose of the contract." Id.

at 116, 487 S.E.2d at 204 (citations omitted).

There are three aspects to Drummond's material breach of contract claim. First,

Drummond alleges that Norfolk Southern breached Article 13 of C-9337 and / or the duty

of good faith and fair dealing by actively impairing Drummond's ability to use its bargained-

---

[8] Article 5 of C-9337 provides that the interpretation and performance of the contract shall be governed by Virginia law.

12

for rates. Second, Drummond contends that Norfolk Southern breached Article 27(i) of the contract by failing to work in good faith with Drummond to identify alternatives that would allow Drummond to meet its minimum volume requirements. Third, Drummond claims that Norfolk Southern breached Article 20(b) by failing to pay in a timely manner infrastructure refunds due to Drummond. As detailed below, the unique factual circumstances presented in this case lead the court to conclude all three aspects of Count One raise questions of fact that must be resolved by a jury.

## A. Article 13

In C-9337, Drummond purchased an opportunity to use a schedule of calculable, guaranteed rates to sell coal to 23 Destinations in the Southeast. Half of these Destinations have been eliminated due to a decline in market conditions. While this market decline does not give rise directly to Drummond's breach of contract claim, it cannot be ignored in the broader context of this case. Drummond's allegations that Norfolk Southern actively impaired its ability to use the rates set forth in Article 13 of C-9337 must be viewed against this factual backdrop.

Of the 11 contractually-designated Destinations still burning coal, three have (or had) transportation contracts with Norfolk Southern during the relevant period that do not list SRT as an origin: Asheville Station (C-9290), Clover Station (C-7545)[9] and Wateree Station (C-9623). All three of these contracts have minimum volume requirements. Thus, these utilities could not take coal on C-9337 without incurring liquidated damages. Nor could Drummond ship coal from SRT on these utility contracts.

---

[9] The parties dispute whether "N&W Origins" in C-7545 includes SRT. Even if it does, it does not change the court's analysis given the minimum volume requirement in this contract.

One of these contracts is worthy of further mention. C-9623, Norfolk Southern's contract with Wateree Station, did not list SRT as an origin. The contract, as amended, had a term of August 9, 2012 through March 31, 2015. One year later—*after* the instant lawsuit was filed—Norfolk Southern entered into a new contract with Wateree Station, C-9815, which had a term beginning March 1, 2016 that was extended by amendment to June 30, 2018. Tellingly, this new contract expressly provides that shipments under C-9337 count towards Wateree Station's minimum volume requirements.

Six of the Destinations that still burn coal have contracts with Norfolk Southern that do include SRT as an origin: Belews Creek, Allen Station, Marshall Station, Roxboro Station, Mayo Station, and McIntosh Station. However, all of these contracts contain minimum volume obligations that preclude the Destinations from taking coal on C-9337 without incurring liquidated damages.[10]

Theoretically, Drummond could have received credit under C-9337 towards its minimum volume requirements (and perhaps avoided shortfall fees) by shipping its coal from SRT to these six Destinations on the utilities' transportation contracts, using their rates. See C-9337 § 27 (providing for credit towards minimum volume requirements for shipments

---

[10] C-9569, covering Belews Creek, Allen Station, and Marshall Station, had a term of July 1, 2010 through August 31, 2010. It required Belews Creek and Allen Station to ship 95% of the coal they receive, and 25% of the coal Marshall Station receives, pursuant to C-9569. A second contract covering these Destinations from September 1, 2010 through June 30, 2018, C-9545, as amended, required all three Destinations to ship 95% of the coal they receive pursuant to C-9545.

C-9290, covering Roxboro Station, Mayo Station, and Asheville Station, has a term of July 1, 2010 through June 20, 2020. It requires Roxboro Station and Mayo Station to ship 95% of the coal they receive, and 85% of the coal Asheville Station receives, pursuant to C-9290. While SRT is listed as an origin with respect to Roxboro Station and Mayo Station, it is not an origin with respect to Asheville Station.

C-9517, covering McIntosh Station, had a term of January 1, 2010 through December 31, 2010, but was amended to extend the term to "the later of (i) April 30, 2016 or (ii) the date by which Shipper has shipped 125,000 tons after May 1, 2015 pursuant hereto." Minimum volume commitments increased by amendment from 60% to 95% at various times in the life of the contract.

14

from SRT to Destinations pursuant to "this Contract and/or any Third Party Contract(s)"). But this is not what Drummond bargained for by entering into C-9337; it bargained for its own schedule of rates, which rates are different than those set forth in the utility contracts.

Drummond, a coal supplier, always had the opportunity to ship coal to the utilities using the utilities' transportation rates. Those rates were previously unknown to Drummond, so Drummond purchased from Norfolk Southern its own fixed set of rates—rates that, as it turns out, are good for only three of the 23 Destinations listed in C-9337: [11] Wateree (as of March 1, 2016, pursuant to C-9815), Wansley Station and Hammond Station.

Norfolk Southern entered into two contracts—one with Drummond, the coal supplier, and one with the utility itself—for the transportation of coal to the same utility Destination. A reasonable trier of fact could find that Norfolk Southern's alleged double dealing so deprived Drummond of the benefit it expected from the base rates set forth in Article 13 of C-9337 that it defeats an essential purpose of the contract and constitutes a material breach. At the same time, a reasonable juror could find that Drummond simply struck a bad bargain by entering into this unique transportation contract as a coal supplier, and that Norfolk Southern did not materially breach C-9337 by entering into separate contracts with the utilities. As Norfolk Southern testified in its Rule 30(b)(6) deposition, C-9337 is the only contract of its type—it does not have any other transportation contracts with coal suppliers, only with utilities. Norfolk Southern R. 30(b)(6) Dep., ECF No. 110-1, at 83-84.

---

[11] Of course, Drummond has not shipped any coal under C-9337 during the relevant contractual term, not even to these three Destinations.

To be sure, C-9337 does not contain a "most favored nations" clause. But the fact that Drummond bought a schedule of rates to use to ship coal to 23 Destinations and, in reality, only had the opportunity to use those rates to ship to three Destinations, cannot be ignored. On top of that, Drummond submits evidence that Norfolk Southern actually incentivized the utilities to source coal from Northern Appalachia and the Illinois Basin region. See Lawson Dep., ECF No. 156-6, at 82-85; ECF No. 92-1; ECF No. 92-17; see, e.g., C-9545, at §§ 18.5, 19.3. A reasonable juror could find on this record that Norfolk Southern actively worked against Drummond and materially breached C-9337 in the process.

Norfolk Southern's alleged breach can take one of two forms. Implicit in the rates set forth in Article 13 and Appendices A-H of C-9337 is Drummond's ability to use those rates. See Schmidt v. Bartech Grp., Inc., 119 F. Supp. 3d 374, 383 (E.D. Va. 2014), aff'd, 620 F. App'x 153 (4th Cir. 2015) ("[W]hat is necessarily implied is as much a part of the instrument as if plainly expressed, and will be enforced as such.") (citing Pellegrin v. Pellegrin, 31 Va. App. 753, 525 S.E.2d 611, 614 (2000)); Southern Ry. Co. v. Franklin & P.R. Co., 96 Va. 693, 32 S.E. 485, 487 (1899) ("It adds nothing to the written contract to infer an obligation to do what was actually intended by the parties and what is essential to give effect and vitality to it."). Thus, there is a question of fact as to whether Norfolk Southern's simultaneous contractual dealings materially breached Article 13 of C-9337. It is for the finder of fact to determine whether Norfolk Southern actively worked to prevent Drummond from shipping coal using the rates set forth in C-9337, which Norfolk Southern acknowledges was an essential purpose of this agreement, and whether the alleged double dealing worked a material breach of the contract. United States ex rel. Virginia Beach Mech. Servs., Inc. v.

16

SAMCO Const. Co., 39 F. Supp. 2d 661, 670 (E.D. Va. 1999) ("A material, as opposed to a minor, breach occurs when the nonbreaching party did not receive the substantial benefit of its bargain."); cf. Va. Elec. & Power Co. v. Bransen Energy, Inc., 850 F.3d 645, 655 (4th Cir. 2017) (Bransen's delivery of coke breeze and subpar coal was first material breach, as essential purpose of parties' agreements was to provide Dominion with coal that would be acceptable performance fuel to test the Plant's operating capacity and comply with environmental regulations).

Alternatively, Drummond argues Norfolk Southern breached the implied duty of good faith and fair dealing. See Tandberg, Inc. v. Advanced Media Design, Inc., No. 1:09cv863, 2010 WL 11569540, at *3 (E.D. Va. Jan. 26, 2010) ("[A]n implied covenant of good faith and fair dealing arises only out of specific contractual provisions; it does not bind the parties where no contractual duty is imposed."). "Violation of the duty of good faith and fair dealing constitutes a breach of contract." 23 Williston on Contracts § 63:22 (4th ed.).

> [C]ourts have viewed "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance" as bad faith. [Restatement (Second) of Contracts § 205] cmt. d. Taken together, these examples sensibly reflect the fundamental principle that a contracting party cannot arbitrarily or unreasonably deprive the other contracting party of the benefit of the parties' contractual bargain. See 23 Richard A. Lord, Williston on Contracts § 63:22 (4th ed. 1990) ("[N]either party shall do anything to injure or destroy the right of the other party to receive the benefits of the agreement."). In the commercial context, and where a covenant of good faith and fair dealing is implied, this general principle prevents a contracting party from "act[ing] in a commercially unreasonable manner while exercising some discretionary power under the contract." Id.; see also U.C.C. § 2–103(b) (2004) (defining good

faith as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade").

Tandberg, 2010 WL 11569540, at *3; see Va. Vermiculite, Ltd. v. W.R. Grace & Co.- Conn., 156 F.3d 535, 542 (4th Cir. 1998) ("[I]t is a basic principle of contract law in Virginia, as elsewhere, that although the duty of good faith does not prevent a party from exercising its explicit contractual rights, a party may not exercise contractual discretion in bad faith, even when such discretion is vested solely in that party."); see also E. Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship, 213 F.3d 175, 184 (4th Cir. 2000) ("[U]nder the covenant of good faith and fair dealing, a party impliedly promises to refrain from doing anything that will have the effect of injuring or frustrating the right of the other party to receive the fruits of the contract between them." (applying Maryland law)). There is a question of fact as to whether Norfolk Southern acted in bad faith or a "commercially unreasonable manner," Tandberg, 2010 WL 11569540, at *3, by actively impairing Drummond's ability to utilize the rates it bargained for in C-9337. Williston, supra, at § 63:22 ("Thus, whether particular conduct violates or is consistent with the duty of good faith and fair dealing necessarily depends upon the facts of the particular case and is ordinarily a question of fact to be determined by the jury or other finder of fact.").

## B. Article 27

There is also a question of fact as to whether Drummond's performance is excused by Norfolk Southern's breach of the express provision of Article 27(i), which provides:

> If for any calendar year or Stub Year, as the case may be, Shipper [Drummond] notifies NS that it anticipates not being able to ship the Guaranteed Volume from Origin to the Destinations, the parties shall work together in good faith to

18

> identify and implement sales and transport alternatives that will
> permit Shipper to satisfy its Guaranteed Volume obligations.

This provision is found in the same Article of the contract that sets forth the guaranteed volumes and required shortfall fees. Article 27(i) appears, to some extent, to ameliorate the harshness of this "take-or-pay" provision of the contract, see Int'l Minerals & Chem. Corp. v. Llano, Inc., 770 F.2d 879, 882-83, 885 (10th Cir. 1985), which is a fundamental purpose of the parties' agreement.

Drummond claims Norfolk Southern breached its contractual obligation to work with Drummond in good faith to find alternatives that would allow Drummond to meet its minimum volume commitments. Instead, Norfolk Southern accepted millions of dollars from Drummond each year in shortfall fees, despite transporting no coal on C-9337.

Norfolk Southern argues this precatory language imposes no legal duty—and even if it did, Article 27(i) imposes a *mutual* obligation on the parties to cooperate in identifying alternatives that would allow Drummond to satisfy its guaranteed volume requirements. Norfolk Southern posits that Drummond never expressly invoked the provision of Article 27(i); rather, it sent perfunctory letters advising it anticipated shipping no coal under the contract and paid the corresponding shortfall fee invoice without protest.

These perfunctory letters, however, plainly put Norfolk Southern on notice that Drummond did not anticipate meeting its guaranteed volume obligations,[12] and between 2011 and 2015, Norfolk Southern accepted payments of more than $35 million in shortfall fees from Drummond despite the fact that it shipped no coal whatsoever under the contract.

---

[12] Norfolk Southern was well aware of the state of the coal market. Its coal group met twice per month to discuss plant closures and traffic flows. Smith Dep., ECF No. 154-3, at 97-108.

Drummond offers evidence that it approached Norfolk Southern with ways to mitigate its liquidated damages under the contract, but its efforts were rebuffed. See Ex. 27 to Steul Dep., ECF No. 132-2; Drummond R. 30(b)(6) Dep., ECF No. 132-6, at 57-76. Drummond further cites evidence that Norfolk Southern knew about potential opportunities through which Drummond could ship coal and avoid shortfall fees, but failed to share that information with Drummond. Norfolk Southern R. 30(b)(6) Dep., ECF No. 110-1, at 236-44; ECF No. 156-3.

Article 27(i) provides that once Drummond notifies Norfolk Southern that it anticipates not being able to ship the guaranteed volume (which Drummond plainly did), the parties "shall work in good faith to identify and implement sales and transport alternatives…." The term "shall" is mandatory in nature. Trumball Investments, Ltd. I v. Wachovia Bank, N.A., 436 F.3d 443, 447 (4th Cir. 2006). Whether Norfolk Southern's efforts constitute good faith within the meaning of Article 27(i), and whether Norfolk Southern's actions constitute a material breach of contract, are questions of fact.

### C. Article 20

The third aspect of Drummond's claim in Count One is that Norfolk Southern breached Article 20(b) by failing to pay the agreed-upon infrastructure refund when shipping coal from the Charleston terminal. Norfolk Southern acknowledges that two of its shipments from SRT—one in 2010 and one in 2016—qualified for this refund, but insists its initial failure to credit Drummond with these refunds was simply an "oversight." See Ex. 1 to Zehringer Decl., ECF No. 132-23; Def. Summ. J. Br., ECF No. 132, at ¶ 49. Norfolk Southern maintains that it satisfied its contractual obligation by adjusting Drummond's

20

shortfall fee to account for the refunds, once the oversight was brought to Norfolk Southern's attention. See Sewell Dep., ECF No. 132-13, at 107-09; Ex. 1 to Smith Decl., ECF No. 132-24. But Drummond is quick to point out that these errors were corrected only after Drummond notified Norfolk Southern. See Norfolk Southern 30(b)(6) Dep., ECF No. 110-1, at 313-19; Ex. 1 to Smith Decl., ECF No. 132-24. Viewed in light of the broader factual circumstances presented in this case—specifically, Norfolk Southern's conduct as a whole—there are questions of fact as to whether Norfolk Southern's failure to pay Drummond the infrastructure refunds it was due under the parties' contract constitutes a material breach.

For these reasons, the cross motions for summary judgment will be **DENIED** as to Count One.

## IV.

Because it is premised on the breach of contract alleged in Count One, Count Two, alleging unjust enrichment, fails as a matter of law. "The existence of an express contract covering the same subject matter of the parties' dispute precludes a claim for unjust enrichment." CGI Fed. Inc. v. FCi Fed., Inc., 814 S.E.2d 183, 190 (Va. 2018) (citing Southern Biscuit Co. v. Lloyd, 174 Va. 299, 311, 6 S.E.2d 601, 606 (1940) ("[A]n express contract defining the rights of the parties necessarily precludes the existence of an implied contract of a different nature containing the same subject matter.")). Accordingly, Norfolk Southern's motion for summary judgment will be **GRANTED** as to Count Two.

## V.

In Count Three, Drummond seeks relief from its contractual obligations by way of

21

the force majeure provision in Article 29. Norfolk Southern argues that environmental regulations do not fall within the language of the force majeure clause. It urges the court to apply rules of statutory construction—specifically, ejusdem generis and noscitur a sociis—to find as a matter of law that no force majeure event, as that term is defined in Article 29, has occurred.

The rule of ejusdem generis applies "when a particular class of persons or things is spoken of in a statute and general words follow." Rockingham Co-op. Farm Bureau v. City of Harrisonburg, 171 Va. 339, 344, 198 S.E. 908, 911 (1938). "'Where general words follow specific words in a statutory enumeration, the general words are [usually] construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.'" Yates v. United States, 135 S. Ct. 1074, 1086 (2015) (quoting Washington State Dep't of Social & Health Servs. v. Guardianship Estate of Keffeler, 537 U.S. 371, 384 (2003)). However, the language in Article 29 does not contain a list of specific words followed by general words. Just the opposite is true, in fact – Article 29 refers generally to "any cause not within the control of said party," and then sets forth the following non-exclusive list of examples:

> [A]ny act of God or of a public enemy or terrorist act, wars, rebellions, labor troubles, strikes, lockouts, riots, embargoes, blockades or interventions or expropriations by government or governmental authorities, interference by civil, military or governmental authorities, other civil unrest, failure or delay of manufacturers, suppliers or other third parties to deliver machinery or equipment or otherwise to perform, or any Force Majeure Event with respect to Kinder Morgan or a Consignee.

Of the two principles of statutory construction, noscitur a sociis—"a word is known by the company it keeps"—is the more applicable here. Yates, 135 S. Ct. at 1085. Courts rely

22

on this principle to "'avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words.'" Id. (citing <u>Gustafson v. Alloyd Co.</u>, 513 U.S. 561, 575 (1995)).

> The maxim of <u>noscitur a sociis</u> provides that the meaning of doubtful words in a statute may be determined by reference to their association with related words and phrases. When general words and specific words are grouped together, the general words are limited and qualified by the specific words and will be construed to embrace only objects similar in nature to those objects identified by the specific words.

<u>Cuccinelli v. Rector, Visitors of Univ. of Virginia</u>, 283 Va. 420, 432, 722 S.E.2d 626, 633 (2012). Applying this tenet of statutory construction, the specific examples of force majeure events set forth in Article 29 of C-9337 lend meaning to the general words "any cause not within the control of said party." None of the events described in this enumeration can be read to encompass the alleged cause of nonperformance here—market conditions resulting from governmental regulation. Environmental regulations are not "act[s] of God" or the result of wars, strikes, civil unrest, or failure of a third party to perform. Changes in market conditions stemming from environmental regulations do not fall within the protection of the force majeure clause for "interventions," "expropriations," or "interference by civil, military or governmental authorities." Nor are they events of the same type as those examples set forth in Article 29. See <u>Swift & Co. v. Columbia Ry. Gas & Elec. Co.</u>, 17 F.2d 46, 48 (4th Cir. 1927) (applying <u>ejusdem generis</u> and holding "[c]rop shortage is not included among the causes specifically mentioned, nor is it of the same general class"); <u>Wheeling Valley Coal Corp. v. Mead</u>, 186 F.2d 219, 222 (4th Cir. 1950) ("Under familiar principles of interpretation, the general expressions 'acts of the government' and 'causes beyond the

control of the lessee' are limited to things of the same general sort as those specifically set forth in the same connection. . . ."); cf. Kansas City Power & Light Co. v. Pittsburg & Midway Coal Mining Co., No. 88-2224 S., 1989 WL 151919, at *2-4 (D. Kan. Nov. 17, 1989) (finding material questions of fact as to whether nonperformance excused by force majeure event, where agreement defined "force majeure" as including "acts or orders of any court, regulatory agency or administrative body having jurisdiction").

Additionally, Article 29 addresses events that directly affect the parties' abilities to perform the contract. See C-9337, § 29(a) (excusing "delay or *nonperformance*" that is "caused in whole or in part" by a force majeure event (emphasis added)); see also id. at § 29(b) ("In the event a party is *unable to perform* its obligations under this Contract because of a Force Majeure Event . . . ." (emphasis added)). In this case, Drummond offers no evidence that environmental regulations render it unable to perform under this contract.

On this point, Sabine Corp. v. ONG Western, Inc., 725 F. Supp. 1157 (W.D. Okla. 1989), is instructive. In Sabine, a gas seller brought suit against a buyer for breach of a take-or-pay contract. Defendant ONG Western, Inc. asserted its take-or-pay obligation under the contract was modified or excused by a force majeure clause. The clause in question provided that the party's contractual obligations would be suspended "[i]f either Buyer or Seller is rendered unable, wholly or in part, by force majeure or other cause of any kind not reasonably within its control, to perform or comply with any obligations or conditions of this contract . . . ." 725 F. Supp. at 1166. The contract defined "force majeure" to include

> acts of God and of the public enemy, the elements, freezing of
> wells or lines of pipe, repairing or altering machinery or lines of
> pipe, fires, accidents, breakdowns, strikes, labor disputes, and
> any other industrial, civil or public disturbance, inability to

24

> obtain materials, supplies, rights-of-way on customary terms,
> permits, or labor, any act or omission by parties not controlled
> by the party having the difficulty, any act or omission (including
> failure to take gas) of a purchaser of gas from Buyer which is
> excused by any event or occurrence of the character herein
> defined as constituting force majeure, failure of gas supply, and
> any laws, orders, rules, regulations, acts, or restraints, of any
> governmental body or authority, civil or military, or any other
> causes beyond the control of the parties hereto.

Id. ONG alleged a number of events, including regulatory changes, which, individually or in combination, resulted in a substantial disappearance in the market for natural gas. Id. at 1166-67. An affidavit submitted by ONG in opposition to plaintiff's motion for partial summary judgment detailed those events and submitted that "the price of gas under ONG's contract with Sabine remained at the highest price paid in the area, while the market price declined substantially." Id. at 1168. This price differential eliminated a major portion of ONG's sales of natural gas. Id. The district court held, however, that ONG "failed to submit any evidence showing that any or all of these alleged force majeure events rendered ONG *unable* to take gas within the meaning of the force majeure clause." Id. at 1171.

ONG cited Rule 1-305 of the Oil and Gas Rules of the Oklahoma Corporation Commission, a rule of a governmental body that arguably falls within the contractual definition of force majeure. See id. at 1166 (defining force majeure to include "any laws, orders, rules, regulations, acts, or restraints, of any governmental body. . . ."). The court held that Rule 1-305 did not render ONG unable to perform, however. Id. at 1170. The court reasoned:

> At best, ONG's evidence demonstrates that the effect of the
> various alleged events of force majeure was a decline in market
> demand and a disparity between ONG's contract price and the
> market price or value of gas, with the result that if ONG were

to have taken the gas, it would have had to resell it at a loss.
Such a loss of market demand which, as opposed to absolute
demand, is a function of price, and the inability to resell gas at a
profit, does not render a party "unable" to take gas.

Id. at 1171 (internal citations omitted).

Here, environmental regulations impacted market conditions. But these events

cannot "reasonably be said to have been among the contingencies contemplated by the

absolving clause." Wheeling Valley Coal Corp., 186 F.2d at 223. And, as in Sabine, there is

no evidence in this record establishing these regulations prevented Drummond from actually

performing under this take-or-pay contract. To be sure, the market for coal is less favorable

to Drummond than it was at the time the contract was executed, and the number of

Destinations burning low-sulfur coal has decreased. Cf. Sabine, 725 F. Supp. at 1179 ("While

Defendant has submitted evidence that it has lost some of its customers and that its

customer base is smaller, it is implicit in affidavits submitted by Defendant and in

Defendant's arguments that Defendant has customers who still need a supply of gas and that

its parent's division, as a public utility, is still obligated to supply customers with gas."

(citation omitted)). But, as Norfolk Southern points out, there is some price at which

Drummond could sell and ship its coal to the remaining Destinations. See Sabine, 725 F.

Supp. at 1171 ("Such a loss of market demand which, as opposed to absolute demand, is a

function of price, and the inability to resell gas at a profit, does not render a party 'unable' to

take gas."); see also N. Ind. Pub. Serv. Co. v. Carbon Cty. Coal Co., 799 F.2d 265, 275 (7th

Cir. 1986) (holding Indiana Public Service Commission's "economy purchase orders" did

not prevent NIPSCO from using the coal it agreed to buy).

There is also another method of performance under this take-or-pay contract—

payment of shortfall fees. Drummond offers no evidence to suggest that it is unable to perform by payment. Indeed, it has been paying shortfall fees to Norfolk Southern each year since the contract's inception.

Because there is no evidence of a force majeure event as defined in Article 29, nor is there evidence that any event would render Drummond unable to perform under this take-or-pay contract, the court will grant Norfolk Southern's motion for summary judgment as to Count Three.

## VI.

Counts Four and Five allege related but legally distinct defenses of frustration of purpose and commercial impossibility / impracticability. The elements of these two doctrines are essentially the same. To survive summary judgment, Drummond must offer evidence to show the contract's principal purpose has been substantially frustrated and/or its performance made impracticable "without [Drummond's] fault by the occurrence of an event the non-occurrence of which was the basic assumption on which the contract was made." Restatement (Second) of Contracts §§ 261, 265; see also id. at § 266.[13]

The Fourth Circuit had occasion to consider the defense of impossibility / impracticability in the case of Opera Co. of Boston v. Wolf Trap Foundation for the Performing Arts, 817 F.2d 1094 (4th Cir. 1987). Opera Company arose out of a contract, pursuant to which the plaintiff agreed to give four staged operatic performances at the Filene Center, an outdoor venue within a national park, sponsored by defendant Wolf Trap

---

[13] The court in Kansas City Power & Light Co. v. Pittsburg & Midway Coal Mining Co., Civ. A. No. 88-2224 S., 1989 WL 151919 (D. Kan. Nov. 17, 1989), described the distinction between these two related doctrines as follows. "[U]nder the doctrine of frustration, performance remains possible but is excused because a fortuitous event supervenes to cause a failure of the consideration or a total destruction of the expected value of the performance of the contract." Id. at *6.

Foundation for the Performing Arts. Wolf Trap, in turn, agreed to make payment to plaintiff and furnish the place of performance, to include lighting equipment. 817 F.2d at 1095. On the date of the final performance, a severe thunderstorm caused a power outage. Wolf Trap, in agreement with the National Park Service, cancelled the performance out of concern for the safety of the performers and attendees. Due to this cancellation, Wolf Trap failed to make the final payment under the contract. Id. at 1095-96. The Opera Company filed suit. Wolf Trap defended on the ground that performance of its obligation was excused under the doctrine of impossibility of performance. Id.

The Fourth Circuit adopted the modern doctrine of impossibility / impracticability, which requires proof of three elements: 1) the unexpected occurrence of an intervening act; 2) that such occurrence was of a character that its non-occurrence was a basic assumption of the agreement of the parties; and 3) that occurrence made performance impracticable. Id. at 1102. The first fact to be established is the existence of an occurrence of an event, the non-occurrence of which was a basic assumption on which the contract was made.

> And, in determining the existence of such occurrence, it is necessary to have in mind the Restatement's definition of an "occurrence" in this context as that which, because of the "destruction, or such deterioration" of a "specific thing necessary for the performance" of the contract "makes performance impracticable."

Id. at 1100. This occurrence must be unexpected but does not necessarily have to be unforeseeable. Id. (citing Transatlantic Financing Corp. v. United States, 363 F.2d 312, 315 (D.C. Cir. 1966)). The question is one of degree—how unexpected at the time the contract was made was the event that prevented performance? Id. at 1101 (quoting Companhia De Navegacao Lloyd Brasileiro v. C.G. Blake Co., 34 F.2d 616, 619 (2d Cir. 1929)).

28

In Opera Company, the court held that "the existence of electric power was necessary for the satisfactory performance by the Opera Company" on the night in question. Id. at 1102. The Fourth Circuit remanded the case to the district court, however, for findings as to "whether the possible foreseeability of the power failure in this case was of that degree of reasonable likelihood as to make improper the assertion by Wolf Trap of the defense of impossibility of performance." Id. at 1103. The court explained:

> Foreseeability, as we have said, is at best but one fact to be considered in resolving first how likely the occurrence of the event in question was and, second, whether its occurrence, based on past experience was of such reasonable likelihood that the obligor should not merely foresee the risk but, because of the degree of its likelihood, the obligor should have guarded against it or provided for non-liability against the risk. This is a question to be resolved by the trial judge after a careful scrutiny of all the facts in the case.

Id. at 1102-03.

In the instant case, Drummond invokes the defenses of impracticability and frustration of purpose based on the unexpected closure or substantial reduction or elimination of imported coal at 12 of the 23 Destinations, as a result of environmental regulations. "[G]overnmental regulation is foreseeable as a matter of law," however, so these defenses must fail. Sabine, 725 F. Supp. at 1177; see N. Ind. Pub. Serv. Co. v. Carbon Cty. Coal Co., 799 F.2d 265, 278 (7th Cir. 1986) (holding impossibility and related doctrines have no place when a fixed-price contract explicitly assigns a particular risk to one party or the other; "[i]t does not matter that it is an act of government that may have made the contract less advantageous to one party").

29

What is more, the evidence in this case suggests that Drummond was aware of environmental conditions that might affect the market for coal at the time the contract was amended in 2010. See Steul Dep., ECF No. 132-2, at 83-85, 89-96, 98, 118-20, 122; Drummond R. 30(b)(6) Dep., ECF No. 132-6, at 120, 129-40. "While it may be true that the extent of the ensuing regulations could not have been foreseen by [Drummond in 2010], it is equally true that the winds of change were blowing and that [Drummond] was aware of that fact." Cook v. Deltona Corp., 753 F.2d 1552, 1558 (11th Cir. 1985).[14]

"The normal risk of a fixed-price contract is that the market price will change." N. Ind. Pub. Serv. Co., 799 F.2d at 275. "If, as is also the case here, the buyer forecasts the market incorrectly and therefore finds himself locked into a disadvantageous contract, he has only himself to blame and so cannot shift the risk back to the seller by invoking impossibility or related doctrines." Id. at 278. C-9337, as amended, was negotiated at arm's length by two sophisticated parties. Drummond took a risk in entering into a transportation contract with Norfolk Southern—indeed, this is the only contract of its kind the rail carrier has—and lost. The non-occurrence of MATS, or any similar environmental regulations, was not a basic assumption of this contract.

Beyond that, Drummond cannot meet the third element of the impracticability defense. To be sure, half of the contractually-designated Destinations have substantially reduced or eliminated coal consumption—or closed altogether. But eleven are still taking coal. Even though Norfolk Southern's third-party utility contracts arguably deter the

---

[14] Indeed, Drummond was interested in the southeastern market to begin with because of the effect of environmental regulations—Drummond could offer low-sulfur coal to Destinations that did not have scrubbing technology. Drummond R. 30(b)(6) Dep., ECF No. 132-6, at 113, 142; ECF No. 156-5.

majority of these Destinations from taking coal pursuant to C-9337, "[p]erformance that has become merely more difficult or unprofitable is not enough to establish objective impracticability." Kansas City Power & Light Co. v. Pittsburg & Midway Coal Mining Co., No. 88-2224 S., 1989 WL 151919, at *5 (D. Kan. Nov. 17, 1989); see also Ballou v. Basic Constr. Co., 407 F.2d 1137, 1141 (4th Cir. 1969) (rejecting defense of impossibility, holding "[t]he manufacture of two hundred acceptable columns might have been extremely difficult or so expensive as to consume any profit the contractor may have contemplated, but neither factor excuses Prestressed's failure to meet its contractual obligation"). Drummond has failed to establish as a matter of law its ability to transport coal under C-9337 is commercially impractical.

Additionally, "[t]o show that performance of the take-or-pay contract by payment is impracticable, even assuming that the other elements of commercial impracticability are satisfied, [Drummond] has the burden of submitting evidence from which a jury could conclude that [Drummond's] performance of the contract by payment would require *unreasonable* expense." Sabine, 725 F. Supp. at 1175. Drummond offers no evidence that its general financial health is threatened by this contract or other extreme financial hardship. Id.; see also id. at 1176 ("Whether 'grave injustice' would result from failure to excuse performance is merely an inquiry used to assess whether the cost to the contracting party of performing the contract is so excessive and unreasonable as to warrant the conclusion that performance has become impracticable." (emphasis omitted)). Indeed, it would undermine the entire purpose of a take-or-pay contract to hold that Drummond's performance is excused as a result of these market changes. The parties' basic agreement was that

31

Drummond would ship a certain quantity of coal on Norfolk Southern rail lines to the Destinations and, if it failed to do so, it would pay a shortfall fee. Market changes do not affect Drummond's performance by payment.

The defense of frustration of purpose fails for the same reasons. It, too, requires proof of three elements: 1) frustration of the principal purpose of the contract; 2) that the frustration is substantial; and 3) that the non-occurrence of the frustrating event or occurrence was a basic assumption on which the contract was made. Id. at 1178. As previously discussed, Drummond has failed to show that the non-occurrence of governmental regulations was a basic assumption on which the parties' contract was made. Also, for reasons discussed supra, Drummond cannot show that any frustration of the principal purpose of the contract is substantial. "[I]n order for frustration of the principal purpose of a contract to be substantial, it 'must be so severe that it is not fairly to be regarded as within the risks . . . assumed under the contract.'" Sabine, 725 F. Supp. at 1179 (citing Restatement (Second) of Contracts § 265 (cmt (a))). "It is not enough that the transaction has become less profitable for the affected party or even that he will sustain a loss." Sabine at 1179 (citing Restatement (Second) of Contracts § 265 (comment (a))).

For these reasons, the court will grant summary judgment in Norfolk Southern's favor on Counts Four and Five.

## VII.

Count Six, seeking rescission, modification or reformation of the contract, is premised on the causes of action set forth above. As such, Norfolk Southern's motion for summary judgment will be denied as to Count Six, to the extent it relies on Count One, and

32

granted to the extent it relies on Counts Two, Three, Four and Five, for the reasons previously stated.

## VIII.

In this case, Drummond raises multiple claims in an effort to excuse its performance under C-9337. Given the unique factual circumstances at play, Count One, alleging prior material breach of contract, raises questions of fact that must be resolved by a jury. As such, the court will **DENY** Drummond's motion for summary judgment (ECF No. 123) and **DENY** Norfolk Southern's motion for summary judgment (ECF No. 122) as to Count One. Because Count Two fails as a matter of law, and because no reasonable fact finder could find in Drummond's favor on Counts Three, Four, and Five, Norfolk Southern's motion for summary judgment (ECF No. 122) will be **GRANTED** as to these claims. Norfolk Southern's motion will be **DENIED** as to Count Six, to the extent it relies on Count One, but **GRANTED** as to Count Six, to the extent it relies on Counts Two through Five.

An appropriate order will be entered.

Entered: *August 21, 2018*

*/s/ Michael F. Urbanski*

Michael F. Urbanski
Chief United States District Judge

33