CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUL 2 2 2019

JULIA C. DUDLEY, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | | |
|---|---|---|
| DRUMMOND COAL SALES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 7:16-cv-489 |
| | ) | |
| v. | ) | |
| | ) | By: Michael F. Urbanski |
| NORFOLK SOUTHERN RAILWAY | ) | Chief United States District Judge |
| COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This action arises out of a protracted contract dispute between plaintiff Drummond

Coal Sales, Inc. ("Drummond") and defendant Norfolk Southern Railway Company

("Norfolk Southern") related to a 2006 contract ("C-9337") for rail transportation services

from a terminal in Charleston, South Carolina to twenty-three (23) contractually specified coal-

burning power plants in the southeastern United States. The parties resolved their initial

dispute in 2010, agreeing to amend certain provisions of the contract and extend its term.

Drummond now seeks a declaration that its performance under C-9337, as amended, should

be excused.

The principal issue remaining in this case is the interplay between Drummond's

contract with Norfolk Southern, i.e., C-9337 (as amended), and Norfolk Southern's

confidential third-party contracts ("Destination Contracts") with various utility customers

("Utilities") that own and operate a specified list of power plants ("Destinations"). The terms

of C-9337 required Drummond to ship a minimum volume of coal each year of the contract

term and pay Norfolk Southern a shortfall fee if it failed to meet that guaranteed volume. In

1

the present action, Drummond contends that Norfolk Southern's separate Destination Contracts precluded the Utilities from accepting coal on C-9337 without incurring liquidated damages, effectively eviscerating the value of C-9337 and depriving Drummond of the benefit of the bargain it struck with Norfolk Southern.

Currently before the court are various motions in limine filed by the parties. These motions have been fully briefed and are ripe for decision. Upon consideration of the evidence and arguments presented by the parties, and for the reasons stated in open court and below, the court rules as follows:

## 1. Drummond Coal Sales, Inc.'s Motion in Limine Number One Regarding the Interpretation and Operation of the Destination Contracts, ECF No. 210

In its first motion in limine, Drummond requests the court either inform the jury of its various legal determinations (or, as variously described by Norfolk Southern, the court's "colloquial observations," "explanatory comments," and/or "generalizations") with respect to the interpretation and operation of the Destination Contracts[1], or permit Drummond to do so. Drummond contends that pertinent provisions of the Destination Contracts are unambiguous, and that because it is well settled that the interpretation of unambiguous contracts is a question of law, "[a]llowing the jury to draw their own conclusions regarding the interpretation or operation of the Destination Contracts would be error . . . ." ECF No. 210, at 4. Drummond cites multiple instances where Norfolk Southern conceded that the Destination Contracts are in fact unambiguous. See, e.g., ECF No. 139, at 3 ("The Contract

---

[1] Destination Contracts refers to Norfolk Southern's separate contracts with the Utilities that "own(ed) and operate(d) the Destinations in the Appendices to C-9337." ECF No. 210, at 1.

and Destination Contracts speak for themselves, and their proper interpretation and application are matters for this Court."); ECF No. 186, at 16 ("The parties further agree that the terms and provisions of these contracts speak for themselves and are not ambiguous. In other words, the parties do not disagree on what these separate contracts say in terms of guaranteed minimums, liquidated damages, origins, rates or refunds relating to specific origins . . .."). In its opposition to Drummond's motion, Norfolk Southern reaffirmed that it has consistently maintained that the Destination Contracts are unambiguous and that the plain language of those contracts "speaks for itself." ECF No. 233, at 7.

Notwithstanding the parties' apparent agreement that relevant provisions of the Destination Contracts are "unambiguous," they diverge as to what the jury should be told and by whom. Drummond contends that although the jury may be asked to determine whether Norfolk Southern's acts and omissions constitute a material breach of C-9337, it should not be asked to interpret the Destination Contracts. Drummond proposes that rather than requiring it to call witnesses to testify about and relitigate the meaning and/or operation of the Destination Contracts, the jury should be instructed by the court or informed by counsel regarding the same. Drummond expressed a willingness to work with counsel for Norfolk Southern on a joint stipulation to address this issue.

Norfolk Southern, for its part, asserts that the jury is entitled to hear its witnesses "about the context in which these contracts arose" followed by "attorney argument about what it all means." ECF No. 262, at 11. Norfolk Southern further asserts that Drummond offers no analysis to support the procedural error it invites, i.e., that in a declaratory judgment case between two parties to a specific contract (C-9337), the court should instruct the jury

about interlocutory legal rulings, made with respect to other contracts (Destination Contracts) between other parties (Norfolk Southern and the Utilities). ECF No. 233, at 3.

To be sure, the Fourth Circuit and the Supreme Court of Virginia have consistently held that the interpretation of an unambiguous contract is a question of law. See Frahm v. United States, 492 F.3d 258, 262 (4th Cir. 2007) (citing Scarborough v. Ridgeway, 726 F.2d 132, 135 (4th Cir. 1984); see also City of Chesapeake v. States Self-Insurers Risk Retention Grp., Inc., 271 Va. 574, 578, 628 S.E.2d 539, 541 (2006) (citing Bentley Funding Group, L.L.C. v. SK & R Group, L.L.C., 269 Va. 315, 324, 609 S.E.2d 49, 53 (2005); Babcock & Wilcox Co. v. Areva NP, Inc., 292 Va. 165, 178, 788 S.E.2d 237, 243 (2016) ("The interpretation and construction of a written contract present only questions of law, within the province of the court, and not of the jury or other trier of fact as long as the contract is unambiguous, and the intent of the parties can be determined from the face of the agreement."); Foreign Mission Bd. of S. Baptist Convention v. Wade, 242 Va. 234, 238, 409 S.E.2d 144, 146 (1991) (holding that the trial court improperly submitted the question of the interpretation of the contract to the jury); see also Va. Model Jury Instructions Civil No. 45.190, Commentary ("Ordinarily, the construction of a written contract is a matter for the court alone. If the terms of the contract are clear and unambiguous, the court alone must construe the contract. In such a case, it is improper to submit the contract to the jury for interpretation" (citations omitted)); cf. Donnert v. Feld Entm't, Inc., 612 F. App'x 657, 661 (4th Cir. 2015) (holding that where a party presents a plausible alternative interpretation of a contract provision, that party is entitled to have the meaning of the provision submitted to the jury for resolution).

Neither Drummond nor Norfolk Southern contend that the Destination Contracts at issue are ambiguous. In general terms, these Destination Contracts impose minimum volume commitments which Drummond argues breach Article 13 of C-9337, either expressly or under the covenant of good faith and fair dealing, because Drummond was unable to use the rates it bargained for in C-9337, resulting in the shortfall fees. Thus, the jury is not going to be called upon to interpret these provisions of the Destination Contracts. Instead, their task will be to determine whether the existence of these Destination Contracts constituted a material first breach of Article 13 of C-9337, relieving Drummond from having to pay shortfall fees. Under the circumstances, the court does not believe it to be appropriate or necessary to preliminarily instruct the jury, as Drummond suggests, on the operation of the Destination Contracts. The fact that these Destination Contracts imposed minimum volume requirements is plain.

The question to be resolved, that of the operation and impact of the minimum volume provisions of the Destination Contracts on Drummond's ability to perform under C-9337, is not one of law, but of fact, requiring the marshaling of evidence and argument. This does not call for contract interpretation requiring a preliminary instruction from the court. As such, Drummond's motion to have the court instruct the jury on the operation of the Destination Contracts is **DENIED**.

**2. Drummond Coal Sales, Inc.'s Motion in Limine Number Two Regarding Parol Evidence Relating to the Destination Contracts, ECF No. 211**

In its second motion in limine, Drummond moves to preclude Norfolk Southern from offering evidence or advancing arguments that contradict unambiguous language contained in the Destination Contracts. Specifically, Drummond moves to prevent Norfolk Southern from

5

claiming, through the deposition testimony of its Rule 30(b)(6) corporate designee, David Lawson, that "as a practical matter," "it would have counted"[2] shipments under C-9337 toward the minimum volume requirements of the Utilities. Lawson's testimony, distilled to its essence, appears to suggest that had any Utility contacted Norfolk Southern and expressed a desire to ship coal under C-9337, it would have granted that request and counted any such shipment toward the Utility's volume commitment. See ECF No. 234-1, at 10 ("Well, I'm telling you as a matter of practical course if the ton had moved, Southern Company would have said to us, [t]hat's a ton that moved in here. It qualifies. We would have said, yeah, absolutely."); see also ECF No. 158, at 7 (". . . as a practical matter, if any Utility had contacted Norfolk Southern and indicated a desire to purchase Drummond coal under the Contract, Norfolk Southern absolutely would have counted any such shipment toward the minimum volume commitment in the Utility's Destination Contract").

Drummond asserts that the unambiguous language of the Destination Contracts does not allow shipments under C-9337 to count toward the Utilities' minimum volume requirements, and Norfolk Southern should not be permitted to claim otherwise after the fact. Drummond asserts that Lawson's statements concerning this "hypothetical scenario" are speculative, self-serving, and contrary to express terms of the Destination Contracts, as well as plainly violative of the parol evidence rule. Drummond further asserts that to allow Norfolk Southern to "retroactively and unilaterally" amend unambiguous contractual provisions that

---

[2] Norfolk Southern appears to concede in its briefing on its third motion in limine, ECF No. 221, that it would not have counted shipments under C-9337 towards the minimum volume requirements contained in the Destination Contracts of at least two Utilities. See ECF No. 221, at 5 (stating that "shipments made pursuant to C-9337 would not have counted towards the C-9290 volume commitment"); id. at 6 (stating "shipments made pursuant to C-9337 would not have counted towards the C-7545 volume commitment").

are detrimental to its position in later litigation would undermine the parol evidence rule and nonsensically allow defendants in breach of contract cases to "offer up speculative hypotheticals about what they purportedly 'would have' done notwithstanding the plain language of a contract in order to excuse their breach." ECF No. 211, at 3.

Norfolk Southern first argues that because the parol evidence rule applies only to statements that were made "prior to or contemporaneous with the contract at issue," and because the deposition statements in question occurred long after C-9337 was executed, the parol evidence rule is inapposite. Norfolk Southern also argues that Lawson, as a corporate designee, is permitted to testify about Norfolk Southern's "knowledge, perceptions, and opinions," and how Norfolk Southern would have handled a request that Drummond coal count toward a Utility's shipping minimum represents an "opinion" of the corporation. See ECF No 234, at 3-4 (citing United States v. Taylor, 166 F.R.D. 356, 361 (M.D.N.C.), aff'd, 166 F.R.D. 367 (M.D.N.C. 1996) (holding that a corporate designee may "present[] the corporation's 'position' on [a given] topic," and "testify about its subjective beliefs and opinions")).

Irrespective of whether Lawson's statements are barred by the parol evidence rule, insofar as they relate to what Norfolk Southern "would have" done had a Utility hypothetically approached it with a desire to ship coal under C-9337, they are plainly speculative and, as such, inadmissible. Rule 30(b)(6) states in pertinent part that:

> [a] party may in the party's notice and in a subpoena name as the deponent a public or private corporation . . . and describe with reasonable particularity the matters on which examination is requested. In that event, the organization so named shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set

> forth, for each person designated, the matters on which the
> person will testify . . . The persons so designated shall testify as
> to matters known or reasonably available to the organization.

Fed. R. Civ. P. 30(b)(6). In short, testimony elicited at the Rule 30(b)(6) deposition represents

the knowledge of the corporation, not of the individual deponents. The designated witness,

therefore, is "speaking for the corporation," and this testimony must be distinguished from

that of a "mere corporate employee" whose deposition is not considered that of the

corporation and whose presence must be obtained by subpoena. 8A Wright, Miller & Marcus

§ 2103, at 36–37.

In United States v. Taylor, 166 F.R.D. 356 (M.D.N.C.), aff'd, 166 F.R.D. 367

(M.D.N.C. 1996), the court summarized a designee's role: "[t]he designee, in essence,

represents the corporation just as an individual represents him or herself at a deposition." Id.

at 361; Martin v. Bimbo Foods Bakeries Distribution, LLC, 313 F.R.D. 1, 8–9 (E.D.N.C. 2016)

(stating that "[a] deposition of a deponent in his individual capacity differs from that of a

deponent as a corporate representative" in that a corporate designee "speaks as the

corporation and testifies regarding the knowledge, perceptions, and opinions of the

corporation"). While a corporate designee is permitted to testify based on facts within the

corporate entity's collective knowledge, rather than only on the basis of the individual's direct

personal knowledge, he or she is otherwise bound by the same evidentiary rules that apply to

lay witnesses (unless designated as an expert, which is not the case here, see ECF No. 208, at

2). See Brazos River Auth. v. GE Ionics, Inc., 469 F.3d 416, 434 (5th Cir. 2006) (holding that

a Rule 30(b)(6) designee may testify "beyond matters personally known to the designee or to

matters in which the designee was not personally involved," including "subjective beliefs and

opinions," "provided the testimony is otherwise permissible lay testimony"); see also ISG Insolvency Grp., Inc. v. Meritage Homes Corp., No. 2:11-CV-01364-PMP, 2013 WL 3043681, at *4 (D. Nev. June 17, 2013), aff'd sub nom. Dev. Specialists, Inc. v. Meritage Homes Corp., 621 F. App'x 434 (9th Cir. 2015) (same).

Generally, lay witness testimony is only admissible if it is "rationally based on the perception of the witness." Fed. R. Evid. 701. In Sempra Energy v. Marsh USA, Inc., No. CV0705431SJOJCX, 2008 WL 11335050, at *14 (C.D. Cal. Oct. 15, 2008), the court held:

> Given this requirement, an individual testifying as a lay witness generally cannot answer hypothetical questions because speculative testimony about what "might have happened" or what a witness "would have done under different circumstances cannot possibly be based on the witness's perception." See Evanston Bank v. Brink's Inc., 853 F.2d 512, 515 (7th Cir. 1988); Am. Gen. Life Ins. Comp. v. Schoenthal Family, L.L.C., 248 F.R.D. 298, 305 (N.D. Ga. 2008); Athridge v. Aetna Casualty & Surety Co., 474 F. Supp. 2d 102, 105 (D. D.C. 2007) (internal citations omitted) (finding that lay witnesses could not testify as to what they would have done if they had been home on the day of the accident because such testimony was "purely speculative" but could testify on other issues based on personal knowledge, such as whether they generally allowed unlicensed, underage family members to use their vehicle). [Instead], the ability to answer hypothetical questions is the essential difference between expert and lay testimony. United States v. Henderson, 409 F.3d 1293, 1300 (11th Cir. 2005) (internal citations omitted). Nevertheless, lay witnesses can testify regarding the lay witness's "particularized knowledge . . . by virtue of his or her position in a particular business." Am. Gen. Life Ins. Comp., 248 F.R.D. at 305 . . .

Id. While Lawson's testimony need not be based on "personal knowledge" per se given the relaxed knowledge requirement afforded corporate designees, it still must be based on information within the corporate knowledge of the organization. In Sempra Energy, the court held that a lay witness cannot testify about whether he believes the plaintiff corporation,

Sempra Energy, "would have" been able obtain an insurance policy had it hypothetically applied for one despite his "personal knowledge and experience" working for the insurance provider because testimony about what "would have" happened under circumstances that never came to pass is speculative. Id. at *13.

The rationale for barring testimony about what "would have" happened in the hypothetical situation at issue in Sempa Energy applies with equal force to Lawson's testimony despite his status as a corporate designee. Indeed, just as a lay witness cannot possess "personal knowledge" about what "would have" occurred in a hypothetical situation, neither can Lawson possess corporate knowledge about what precisely "would have" happened if, hypothetically, a Utility had approached Norfolk Southern with a request to count coal shipped under C-9337, without engaging in speculation. This is especially so given that, as far as C-9337 is concerned, no Utility appears to have ever approached Norfolk Southern with such a request.

This finding is consistent with the handful of cases holding that corporate designees are generally not allowed to provide opinion testimony based on hypothetical situations. See Firefighters' Ret. Sys. v. Citco Grp. Ltd., No. CV 13-373-SDD-EWD, 2018 WL 2158769, at *5 n.32 (M.D. La. May 10, 2018) (collecting cases); Edwards v. Scripps Media, Inc., No. CV 18-10735, 2019 WL 1647803 (E.D. Mich. Apr. 16, 2019) (holding that hypothetical questions are not appropriate for deposition of corporation's designee since deponent would have to answer with personal opinion rather than corporate position); Byrd v. Wal-Mart Transp., LLC, No. CV609-014, 2009 WL 3055303, at *3 (S.D. Ga. Sept. 23, 2009) (finding that hypothetical questions are never appropriate for a Rule 30(b)(6) depositions); Consumer Fin. Prot. Bureau v. Borders & Borders, PLC, 2016 WL 9460471, *8 (W.D. Ky. June 29, 2016) (rejecting topics

that were irrelevant and "entirely hypothetical"); MCI Telecommunications Corp. v. Wanzer, 897 F.2d 703, 706 (4th Cir. 1990) (noting the distinction between opinion testimony based on "personal knowledge" and opinion testimony based on "hypothetical facts" (citation omitted)).

Drummond does not dispute that Norfolk Southern may offer testimony and other evidence about what it has actually done under similar circumstances in the past, and from such testimony, it "could try to suggest to the jury the ultimate hypothetical that their witness testified to." ECF No. 263, at 17. Drummonds asserts, however, that Norfolk Southern appears intent to go one step further by asking Lawson to opine as to the application of past practices in the present case. For the reasons stated above, the court finds that such testimony would veer into inadmissible speculation. Neither of the cases cited by Norfolk Southern compel a different result. See ECF Np. 234, at 2-3 (citing Int'l Org. of Masters, Mates & Pilots, Atl. & Gulf Region, AFL-CIO v. Coal Terminal Towing Corp., No. 83-446-N, 1984 WL 49133 (E.D. Va. Mar. 30, 1984) and Amos v. Coffey, 228 Va. 88, 320 S.E.2d 335 (1984)).

In Int'l Org. of Masters, Mates & Pilots, Atl. & Gulf Region, AFL-CIO v. Coal Terminal Towing Corp., No. 83-446-N, 1984 WL 49133 (E.D. Va. Mar. 30, 1984), the court simply held that because the parol evidence rule does not apply to "subsequent acts" or "conduct" by the parties, courts may examine a course of performance to determine if the "clear meaning of the words" at issue was later "limited in any way." Id. at *6. Norfolk Southern does not point to any subsequent acts or conduct between parties in this case of the sort at issue before the court in Int'l Org. of Masters, which, notably, went on to hold that the defendant could have changed the meaning of the term at issue by "inserting appropriate

language to clarify the alleged true intention," but because it chose not to do so, it "cannot be heard at this point during litigation to say that the plain words do not mean what they say." Id. at *4. In Amos v. Coffey, 228 Va. 88, 320 S.E.2d 335 (1984), the Supreme Court of Virginia, although noting that the parol evidence rule concerns "prior or contemporaneous" statements, nevertheless affirmed a lower court's refusal to admit testimony which, much like the testimony offered by Lawson, "tended to vary and contradict the intention of the parties" as expressed in an "unambiguous and unconditional" deed. Id. at 94, 320 S.E.2d at 338.

In sum, because Lawson's testimony regarding how Norfolk Southern "would have" handled a request from a Utility to count coal shipped under C-9337 is speculative, it is inadmissible, and Drummond's motion is **GRANTED** to this extent. Norfolk Southern may, however, offer evidence as to how it has responded historically to similar requests from other customers.

### 3. Drummond Coal Sales, Inc.'s Motion in Limine Number Three Regarding the Parties' Prior Lawsuit, Settlement Agreement and Negotiations, ECF No. 212 & Drummond Coal Sales, Inc.'s Motion in Limine Number Six Regarding Other Litigation, ECF No. 215

In its third and sixth motions in limine, Drummond moves to preclude Norfolk Southern from referencing, discussing, or offering evidence of prior litigation, settlement agreements, and/or settlement negotiations in the cases styled Norfolk Southern Railway Company, Inc. v. Drummond Coal Sales, Inc., 7:08-cv-340 (W.D. Va.), and Drummond Coal Sales, Inc. v. Kinder Morgan Operating LP "C", 2:16-cv-345 (N.D. Ala.).

### A.

In its third motion in limine, Drummond moves to preclude Norfolk Southern from referencing the parties' prior litigation and settlement in the case styled Norfolk Southern Railway Company, Inc. v. Drummond Coal Sales, Inc., 7:08-cv-340 (W.D. Va.), in a manner that portrays it as unduly litigious and/or a "serial litigant" whose claims should be discredited. ECF No. 263, at 20. Drummond claims that Norfolk Southern "clearly wishes to argue to the jury that it should disregard Drummond's claims because [it] is a serial litigant, looking for any way to escape its obligations under C-9337." ECF No. 254, at 5. Drummond stated at oral argument that it is not concerned that counsel might "hint" at the existence of prior litigation, but that Norfolk Southern will incense the jury by attempting to portray it, in the words of counsel for Norfolk Southern, as "using litigation as an extension of its commercial practices" or as a "business tool to renegotiate or get out of this contract." ECF No. 263, at 37-38.

Drummond requests that references to and evidence of Norfolk Southern Railway Company, Inc. v. Drummond Coal Sales, Inc., 7:08-cv-340 (W.D. Va.), be excluded because such evidence is irrelevant under Rule 401, and its probative value is substantially outweighed by the potential prejudice under Rule 403 of the Federal Rules of Evidence. Specifically, Drummond claims that because Norfolk Southern's acts and omissions that form the basis of its prior material breach claim occurred after the parties executed their settlement in 2009, evidence of the parties' prior litigation and/or settlement agreement, and related theories, claims, and defenses, is inadmissible because it has no bearing on whether Norfolk Southern committed a material breach after the settlement of that prior litigation. ECF No. 254, at 5. Drummond further asserts that such evidence is inadmissible under Rule 408, which, broadly

speaking, limits the admission of statements or conduct intended to be part of compromise or settlement negotiations. Fed. R. Evid. 408.

Norfolk Southern contends that the court should allow the introduction of evidence pertaining to <u>Norfolk Southern Railway Company, Inc. v. Drummond Coal Sales, Inc.</u>, 7:08-cv-340 (W.D. Va.), because it provides "irreplaceable factual context for the present lawsuit" and is crucial in elucidating the "history of the parties' relationship." ECF No. 263, at 30. Norfolk Southern further contends that Rule 408 does not bar evidence that prior litigation occurred; rather it bars the use of settlement-related evidence to "prove or disprove the validity or amount of a disputed claim" or to "impeach by a prior inconsistent statement or a contradiction." Fed. R. Evid. 408.

With respect to relevancy, Norfolk Southern's argument is twofold. First, Norfolk Southern notes that it is for a purported breach of C-9337, the terms of which were amended pursuant to the 2009 settlement agreement, that Drummond is presently suing on, and restricting its ability to introduce evidence of the settlement agreement would prevent the jury from receiving the "whole story." ECF No. 263, at 22-23. Second, Norfolk Southern claims that because Drummond has specifically alleged a breach of the covenant of good faith and fair dealing, evidence of the parties' "business relationship," which includes the circumstances surrounding the settlement of its prior litigation, would assist the jury in (1) interpreting C-9337, (2) determining the "intent" of the parties, and (3) making an informed finding as to whether Norfolk Southern materially breached its good faith obligations by entering into the Destination Contracts. In short, Norfolk Southern argues that the evidence in question would

provide the jury with "much-needed context and factual background when interpreting the C-9337 and attempting to ascertain the parties' intent." ECF No. 235, at 6.

It was evident at the court's hearing that despite talking past one another in their respective briefs, the parties agree that some references to and evidence of the underlying facts that ultimately resulted in the late-2009 settlement and amendment of C-9337 may be admissible at trial insofar as such evidence is relevant and not otherwise barred by Rule 408. Given that it is not at all clear what "evidence" is precisely at issue or how it will be used, the court cannot rule definitively on its relevancy and admissibility. Certain issues and facts related to the dispute that formed the basis for the 2009 settlement are relevant in contextualizing the present dispute between the parties. See, e.g., Franke v. Tig Ins. Co., No. 13-CV-13432-DT, 2015 WL 5697597, at *3 (E.D. Mich. Sept. 29, 2015) (holding that "[a]lthough evidence of past litigation and settlements is to be excluded," it would be unfairly prejudicial to plaintiff to exclude any mention of the underlying facts resulting in the past litigation and settlements"). Drummond appeared to concede as much at oral argument. ECF No. 263, at 33 ("[T]here can be discussion that the parties got into a dispute about [shortfall fees], ultimately resolved that dispute with an amended contract."); id. at 31 ("I'm not concerned . . . about [Norfolk Southern] talking about the history of the parties, there was an original contract and there's an amended contract, and there was some course of dealing leading up to the amended contract . . . [a]ll of those are factual . . . [t]hey can talk about that"). Drummond asks only to preclude Norfolk Southern from perseverating about and overelaborating the existence of prior litigation such that a "serial litigant" theme of the case emerges and impairs the ability of the jury to decide the present case on the merits. Id. at 33-35 (arguing that "who sued who, whose

theories were what," "did it get to summary judgment, was it mediated in front of Your Honor," "was it late at night," "what was talked about" is inadmissible).

The motion is **GRANTED** to the limited extent that Norfolk Southern may attempt to argue or invoke its prior litigation history with Drummond to portray Drummond as a serial litigant as it appeared to do at oral argument on this motion. The motion is **DENIED** to the extent that Norfolk Southern references the prior litigation for the purpose of providing some history and context as to the present dispute.

### B.

In its sixth motion in limine, Drummond similarly moves for the exclusion of any references to, discussion of, or evidence regarding the case styled Drummond Coal Sales, Inc. v. Kinder Morgan Operating LP "C", 2:16-cv-345 (N.D. Ala.) ("Kinder Morgan"), on grounds that it is irrelevant to the narrow issue in this case under Rule 401, and its probative value is outweighed by the danger that it will confuse the jury and is unduly prejudicial under Rule 403 of the Federal Rules of Evidence.

Generally, courts exclude evidence of other lawsuits, even if such lawsuits are related to the case before it. See Board of Trs. of the AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A., 860 F. Supp. 2d 251, 254 (S.D.N.Y. 2012); see also United States v. Hill, 322 F.3d 301, 306 (4th Cir. 2003) (affirming a trial court's exclusion of evidence of another lawsuit which "would have necessitated an exhaustive case within a case that would have confused the jury as to the issues to be decided"); New Am. Mktg. FSI LLC v. MGA Entm't, Inc., 187 F. Supp. 3d 476, 481 (S.D.N.Y. 2016) (agreeing with plaintiff that evidence of other litigation to which plaintiff was a party would be irrelevant and unduly prejudicial); Park W. Radiology v.

CareCore Nat. LLC, 675 F. Supp. 2d 314, 330 (S.D.N.Y. 2009) (finding that any probative value of the evidence of other litigation is "substantially outweighed by the risk of unfair prejudice, confusion of the issues, misleading the jury, and waste of time"); L-3 Communications Corp. v. OSI Systems, Inc., No. 02 Civ. 9144 (PAC), 2006 WL 988143, at *10 (S.D.N.Y. Apr. 13, 2006) (noting that, "[a]lthough evidence related to [prior litigation] may be relevant it runs the risk of being highly prejudicial"); Arlio v. Lively, 474 F.3d 46, 53 (2d Cir. 2007) (noting that "courts are reluctant to cloud the issues in the case at trial by admitting evidence relating to previous litigation involving one or both of the same parties"); Wytex Prod. Corp. v. XTO Energy, Inc., No. CIV-12-339-JHP, 2014 WL 12799569, at *5–6 (Aug. 29, 2014) (holding that other lawsuits against defendant "are not relevant to this lawsuit unless the outcome is res judicata on an issue involved herein"); Abu Dhabi Commercial Bank v. Morgan Stanley & Co., No. 08-Civ.-7508 (SAS), 2013 WL 1155420 (S.D.N.Y. March 20, 2013) (holding that that the testimony of parties in the case discussing relevant issues may be admissible, but references to other lawsuits, "including their factual allegations and evidence," are inadmissible).

Norfolk Southern opposes Drummond's motion, claiming that the "central issues" in the present case are the same as those in Kinder Morgan, namely, "should Drummond be excused from shipping its guaranteed minimum volumes of coal . . . and paying the shortfall fees due to the allegedly wrongful actions or omissions of Norfolk Southern and Kinder Morgan . . . [o]r should Drummond be held to performing its contractual obligations to ship or pay, because Drummond's failure to ship its minimums thus far is the result of Drummond's calculated business decision to sell its coal elsewhere for more money?" ECF

No. 238, at 1-2. Norfolk Southern notes that evidence of (1) Drummond's 2012 Side Letter Agreement with Kinder Morgan, (2) Drummond's decision to remove cranes from the Charleston Shipyard River Terminal, and (3) Drummond's statements to Kinder Morgan in 2012 that it did not intend to deliver any coal to the Charleston Shipyard River Terminal are relevant in the present case. Specifically, Norfolk Southern asserts that the aforementioned evidence tends to prove that Drummond was not precluded from shipping coal on C-9337 due to the Destination Contracts or anything else that Norfolk Southern did or failed to do, but rather opted to sell its coal elsewhere at a greater profit. ECF No. 238, at 3-4. Norfolk Southern urges the court to deny the motion and permit it to refer to and offer evidence regarding the Kinder Morgan case "insofar as that evidence is relevant to the issues the jury will be asked to decide in this action." Id. at 4.

Norfolk Southern's tendentious framing of the "central issues" above elides the fact that there is no discernible "overlap" between the sole remaining legal issue in Kinder Morgan and the sole remaining legal issues in the present matter.[3] Indeed, Kinder Morgan never involved a prior material breach claim, see ECF No. 238, at 2 n.1; ECF No. 238-1, at 6. Nor does Drummond's dispute with Kinder Morgan involve C-9337 specifically or Destination Contracts generally. The memorandum opinion and motion for summary judgment attached as exhibits to Norfolk Southern's opposition brief indicate that the sole remaining issue in the Kinder Morgan case is whether Drummond is excused from performing because the Charleston Shipyard River Terminal did not have the throughput capacity of 4,000,000 metric

---

[3] While both cases initially involved a force majeure claim, the court granted summary judgment as to that claim. See ECF No. 181.

tons of coal a year as required by contract. See ECF No. 238-1, at 25-28; ECF No. 238-2, at 8 (indicating that the only remaining count seeking rescission of the contract is "based on the Terminal's so-called 'capacity'").

Here, again, Drummond indicated at oral argument that it is not requesting that Norfolk Southern be preemptively precluded from referencing facts or "certain pieces of evidence . . . in the Kinder Morgan case," ECF No. 263, at 36, such as Drummond's execution of a Side Letter Agreement with Kinder Morgan, see ECF No. 257, at 2. Drummond conceded that such evidence "could be relevant," and that it will object to any such evidence as appropriate if and when Norfolk Southern attempts to offer it. Id. at 36. Drummond wishes to specifically preclude reference to "the fact that there is litigation ongoing between us and Kinder Morgan." Id.; see ECF No. 257, at 2 (requesting Norfolk Southern be precluded from arguing or referencing the fact that Drummond is involved in a separate lawsuit against Kinder Morgan). Drummond is yet again attempting to prevent Norfolk Southern from framing its defense around what is calls an "entirely improper theme," namely, that Drummond is a serial litigant attempting to escape its contractual obligations. Drummond's chief concern is that Norfolk Southern will invoke the Kinder Morgan case to argue, as it did during oral argument on this motion, that Drummond "uses litigation as an extension of its commercial practices" and/or as a "business tool" to renegotiate or avoid its contractual obligations and has done so on "two fronts." ECF No. 263, at 37-38. Drummond appears concerned that referencing or arguing about the Kinder Morgan case would engender a minitrial on ongoing, unresolved litigation and unnecessarily distract and confuse the jury, as well as prevent it from deciding this case on the merits.

The introduction of evidence to suggest that a plaintiff is litigious is typically prohibited because it poses a substantial danger of jury bias. See, e.g., Cuthie v. J&J Material Handling Sys., Co., No. 1:10-CV-555, 2012 WL 13001385, at *2 (M.D. Pa. Feb. 2, 2012) (excluding evidence of prior litigation due to the high likelihood that the jury will draw the prejudicial inference that the plaintiff is a "litigious person" and because "reference to prior litigation or settlement will likely, as it so often does, lead us to a trial within a trial"); Spellbound Dev. Grp. Inc. v. Pac. Handy Cutter Inc., No. SACV 09-0951 DOC ANX, 2012 WL 8748801, at *3 (C.D. Cal. Feb. 24, 2012) (cautioning plaintiff to limit its evidence to the facts adduced in the prior litigation and to not introduce evidence merely to show defendant's litigiousness); Alwood v. Ecolab, Inc., No. CV 14-101-BLG, 2016 WL 5793352, at *2 (D. Mont. Oct. 3, 2016) (holding that no evidence will be admissible at trial merely as a vehicle for demonstrating plaintiff's "purportedly litigious nature" as such evidence is "highly likely to unfairly prejudice the jury, and that possibility substantially outweighs its negligible probative value"); Norton v. Rosier, No. 7:14-CV-00260-FL, 2019 WL 346709, at *4 (E.D.N.C. Jan. 28, 2019), as amended (Mar. 1, 2019) (granting plaintiff's motion to exclude evidence of seven other lawsuits). Generally, to be admissible, evidence of a plaintiff's prior litigation must tend to show something other than plaintiff's tendency to sue. See Gastineau v. Fleet Mortgage Corp., 137 F.3d 490, 495-96 (7th Cir. 1998).

The motion is **GRANTED** to the limited extent that Norfolk Southern may attempt to invoke or argue about Drummond's ongoing litigation with Kinder Morgan to cast Drummond as a serial litigant. The motion is otherwise **TAKEN UNDER ADVISEMENT** until such time as the motion is placed in the appropriate context. To the extent that Norfolk

Southern identifies some proper, relevant purpose for referencing or offering evidence related to <u>Drummond Coal Sales, Inc. v. Kinder Morgan Operating LP "C"</u>, 2:16-cv-345 (N.D. Ala.), this evidence may be admitted. Norfolk Southern may make no mention of the <u>Kinder Morgan</u> case in opening statement or at trial until further order of the court.

### 4. Drummond Coal Sales, Inc.'s Motion in Limine Number Four Regarding Its Financial Condition and Sale of Coal, ECF No. 213

In its fourth motion in limine, Drummond urges the court to preclude reference to or evidence of Drummond's financial condition, including its sale of coal to customers other than those Utilities which owned or operated the Destinations identified in C-9337, as well as the profit generated from its overseas sales. Drummond clarified at oral argument that its "concern is getting into the numbers and exactly where it[s] [coal] went . . . ." ECF No. 263, at 41. Drummond claims such evidence is not relevant because it is not seeking monetary damages in the form of lost profits; rather it is seeking only that its performance under C-9337 be excused through a declaratory judgment. Stated differently, Drummond argues that because it does not have to prove, nor does it assert, monetary damages as part of its prior material breach claim, evidence related to its financial or sales information is irrelevant under Rule 402 of Federal Rules of Evidence.

Norfolk Southern argues that evidence of Drummond's coal sales overseas is directly relevant in several respects to Drummond's multifaceted breach of contract claim as that claim has been framed by the court in its disposition of Norfolk Southern's motion for summary judgment:

> There are three aspects to Drummond's material breach of
> contract claim. First, Drummond alleges that Norfolk Southern
> breached Article 13 of C-9337 and/or the duty of good faith and
> fair dealing by actively impairing Drummond's ability to use its
> bargained-for rates. Second, Drummond contends that Norfolk
> Southern breached Article 27(i) of the contract by failing to work
> in good faith with Drummond to identify alternatives that would
> allow Drummond to meet its minimum volume requirements.
> Third, Drummond claims that Norfolk Southern breached
> Article 20(b) by failing to pay in a timely manner infrastructure
> refunds due to Drummond.

ECF No. 181, at 12-13; see ECF No. 64, at 8-9 ("Norfolk Southern did not make any offers

or any other good faith efforts to assist [Drummond] in meeting its Guaranteed Volume

obligations."). Norfolk Southern asserts that the evidence Drummond seeks to exclude is

directly relevant to the first two aspects the court identified – Drummond's Article 13 and

Article 27(i) claims. This motion is easily resolved on the basis of Article 27(i) alone.

Article 27(i) provides that in the event Drummond anticipates not being able to satisfy

its minimum volume requirements per the terms of C-9337, the "parties shall work together

in good faith to identify and implement sales and transport alternatives . . . ." See ECF No.

181, at 19. Drummond alleges that Norfolk Southern breached its contractual obligation to

work with it in good faith under Article 27(i) by (1) doing "absolutely nothing" in response to

Drummond's annual notices stating that it did not anticipate meeting the contractual minimum

volumes, (2) rejecting all of Drummond's transport alternative proposals, (3) offering no

alternatives of its own, and (4) incentivizing the Utilities not to source coal from Drummond

by penalizing them for doing so. See ECF No. 255, at 6.

Norfolk Southern has maintained throughout this litigation that Drummond never

expressly invoked Article 27(i) or attempted to cooperate in identifying transport alternatives.

Specifically, Norfolk Southern claims that Drummond did not contact it to request that the parties "work together" in identifying and implementing sales or transport alternatives; rather Drummond sent perfunctory "zero ton" letters simply advising Norfolk Southern that it anticipated shipping no coal under C-9337, and paid the corresponding shortfall fee invoice without protest. See ECF No. 124, at 16. Norfolk Southern further asserts that Drummond's failure to press for transport alternatives or meaningfully engage with it on the issue of shortfall fees was a product of Drummond's business decision to sell its coal more profitably in European markets. See ECF No. 241, at 40. Given the alleged financial incentives to sell its coal abroad, Norfolk Southern asserts that Drummond had no intent to "work together" with it to find alternative ways to sell its coal in the southeastern United States.

In denying the parties' cross motions for summary judgment, the court noted that Drummond offered evidence that it approached Norfolk Southern with ways to mitigate its liquidated damages under C-9337. The court also noted that Norfolk Southern knew about potential opportunities through which Drummond could ship coal and avoid shortfall fees but failed to share that information with Drummond. ECF No. 181, at 20. Finally, the court concluded that whether these acts or omissions on the part of Norfolk Southern violated its "good faith" obligations under Article 27(i) presented a genuine issue of fact for the jury. Id. Notwithstanding these findings, the court agrees with Norfolk Southern that evidence of Drummond's coal sales overseas and any profits derived therefrom is clearly probative of Drummond's intent (or lack thereof) to "work together in good faith" with Norfolk Southern in identifying transport alternatives. Accordingly, Drummond's motion is **DENIED**.

5. **Drummond Coal Sales, Inc.'s Motion in Limine Number Five Regarding Illinois Basin Coal Reserves Owned by Non-Parties, ECF No. 214**

In its fifth motion in limine, Drummond moves to preclude Norfolk Southern from referencing or offering evidence that Garry Neil Drummond's[4] children own rights to coal reserves in the Illinois Basin. Drummond claims that Norfolk Southern's deposition designations suggest that it intends to offer evidence that some of Drummond's children own an interest in an unspecified amount of Illinois Basin reserves. Considering that only Drummond Coal Sales, Inc. is the party to C-9337, Drummond asserts that whether and to what extent Drummond's children may individually hold an interest in some amount of Illinois Basin reserves is irrelevant to the claims and defenses in this case under Rule 402, and unduly prejudicial and/or likely to confuse the jury under Rule 403 of the Federal Rules of Evidence.

Norfolk Southern again argues that the information Drummond seeks to exclude would deprive the jury of "important context," as it "explains how the entire contractual relationship between Drummond and Norfolk Southern started." ECF No. 237, at 1. Norfolk Southern claims that discussions about Drummond's Illinois Basin reserves formed the "historical basis" for the initial discussions between the parties that ultimately led to the execution of C-9337 in 2006. Additionally, Norfolk Southern asserts that evidence of Drummond's "ready access" to Illinois Basin reserves is "directly relevant" to rebut Drummond's claim that by incentivizing the Utilities to source coal from the Illinois Basin, Norfolk Southern was trying to cut Drummond "out of its business channel." ECF No. 237,

---

[4] Garry Neil Drummond is the former Chief Executive Officer of Drummond Company, Inc.

at 3. Norfolk Southern argued in open court that "if the Drummond children owned these copious reserves in Illinois Basin, I think there's a . . . reasonable inference to be made that if Drummond really wanted to be in that market it could have been in that market." See ECF No. 262, at 50-51. Norfolk Southern's only other argument is that because the Illinois Basin reserves are mentioned in multiple internal Drummond reports, evidence regarding Drummond's access to this coal basin is relevant and admissible. Id.

Drummond notes that there is no evidentiary support for the false conclusion Norfolk Southern wishes the court and a jury to reach, namely that "Drummond Coal Sales, Inc. – the plaintiff in this case – owns and mines [Illinois Basin] coal reserves and therefore benefitted from the [Illinois Basin] rate reductions, refunds and minimum volume requirements that Norfolk Southern included in the Destination Contracts." ECF No. 256, at 1. Drummond further notes that its president, under persistent questioning by Norfolk Southern, affirmed that Drummond neither owns Illinois Basin coal nor has ever produced coal out of the Illinois Basin. Norfolk Southern appeared to concede at oral argument that it will not assert that Drummond Coal Sales, Inc. actually "owns" Illinois Basin coal. See ECF No. 262, at 50 ("If their motion is they don't want us to say that Drummond Coal Sales, the party in this case, actually owned those reserves, I don't think we have an issue about that."). Nevertheless, Norfolk Southern stood by their contention that evidence of the fact that "people or entities" affiliated with Drummond own Illinois Basin reserves "casts doubt on the credibility of [Drummond's] argument that . . . Norfolk Southern was trying . . . to cut[] [Drummond] out of this particular market." ECF No. 263, at 50-51.

Norfolk Southern, however, has made no showing that during the life of C-9337, the

reserves purportedly owned by the Drummond children were accessible or otherwise could have been mined, rendering evidence of the ownership of such reserves by non-parties to this litigation entirely irrelevant. Drummond added that not only is there no evidence of active mining, but there is also no evidence of any testing or that there is provable, economically recoverable coal in the Illinois Basin reserves owned by the Drummond children. ECF No. 262, at 52. The court finds that there is no relevant basis for admitting the contested evidence. Given that the reserves in question are not owned by either party to this litigation, admitting evidence as to their ownership creates an unnecessary risk of confusing the issues and the jury. The motion is therefore **GRANTED**.

### 6. Norfolk Southern's Motion in Limine to Exclude Parol Evidence, ECF No. 216

In its first motion in limine, Norfolk Southern moves to prevent Drummond from presenting any evidence or argument regarding alleged promises or representations made by Norfolk Southern to Drummond prior to the execution of C-9337 that are not expressly found in C-9337. Specifically, Norfolk Southern wishes to prevent Drummond and its witnesses from claiming that while negotiating C-9337 in 2005, Norfolk Southern "promised" Drummond that their relationship represented a (1) "strategic partnership" between the parties and that the (2) rates under C-9337 would always be lower than the rates under Norfolk Southern's separate contracts with the Utilities and/or other third parties. Norfolk Southern claims that such statements are inadmissible because C-9337 contains a clear integration clause and because they are excludable under the parol evidence rule. See ECF No. 217, at 2-7.

Drummond concedes that C-9337 contains an integration or "merger" clause stating that "[t]his Contract constitutes the entire understanding of the parties with respect to the subject matter hereof and may not be modified or changed except by written amendment signed by an authorized representative of each party." ECF No. 240, at 1; see ECF No 217, at 3. Drummond further conceded at oral argument that regarding the alleged promise that its rates under C-9337 would always be lower than any rates between Norfolk Southern and the Utilities, such a promise is rendered inadmissible by the integration clause. See ECF No. 263, at 59 (regarding Norfolk Southern's promise that "we're always going to have better rates than anybody else, I'll concede we probably can't go that far due to the integration clause . . ."); id. at 60 (regarding the "promise of always lower rates, I think I have to concede that we cannot go there."). In light of this concession, and the court's agreement with Drummond's bases for making it, the court will not trudge through the parties' various arguments on this issue. Suffice it to say, the combined effect of C-9337's integration clause, the parol evidence rule's bar on the introduction of prior negotiations and agreements of the sort alleged here, and the conspicuous absence of a most-favored-nation clause guaranteeing Drummond lower rail rates, is to unequivocally preclude the introduction of evidence of Norfolk Southern's alleged pre-execution rate-related promise.

With respect to the evidence that Norfolk Southern allegedly indicated to Drummond that C-9337 was intended to represent a "strategic partnership" with Drummond, generalized statements of this sort do not, in and of themselves, violate the parol evidence rule. In Virginia, "parol evidence of prior or contemporaneous oral negotiations or stipulations is inadmissible to vary, contradict, add to, or explain the terms of a complete, unambiguous, unconditional,

written instrument." In re BNX Sys. Corp., 310 F. App'x 574, 576 (4th Cir. 2009) (citing Godwin v. Kerns, 178 Va. 447, 17 S.E.2d 410, 412 (1941)). The "strategic partnership" representation does not obviously "vary, contradict, add to, or explain" the terms of C-9337 in a manner that undermines the effect of the integration clause or runs afoul of the parol evidence rule. Drummond asserted at oral argument that this representation merely provides "context and background" explaining why Drummond entered into this "unique" contract in the first place. ECF No. 263, at 59. Insofar as Drummond confines its evidence and argument to this specific purpose, the court cannot hold that its introduction is impermissible. The parol evidence rule, however, does preclude the use of this evidence to argue for or insinuate the existence of additional obligations on the part of Norfolk Southern.

In sum, the motion is **GRANTED** as to any evidence or argument concerning promises allegedly made by Norfolk Southern related to rail rates that predate the execution of C-9337. The motion is **DENIED** as to the "strategic partnership" representation to the limited extent that such evidence is used to provide pertinent context.

7. **Norfolk Southern's Motion in Limine to Exclude Reference to Relocation or Closure of Norfolk Southern's Roanoke Operations, ECF No. 218**

In its second motion in limine, Norfolk Southern moves to exclude reference to organizational changes and relocations that affected a significant number of Norfolk Southern employees in the Roanoke, Virginia area. Norfolk Southern is concerned that based on questioning during depositions, Drummond may reference the office relocation and the resulting effect on employees. Norfolk Southern argues that such references would be inappropriate, irrelevant, and unduly prejudicial, as the relocation of Norfolk Southern's

Roanoke office has no bearing on any claim or defense in this case. Drummond did not respond to this motion, nor did it express any intent to discuss this issue unless needed to respond to arguments or issues raised by Norfolk Southern at trial. The motion is therefore **GRANTED**.

8. **Norfolk Southern's Motion in Limine to Exclude Evidence Relating to Transportation Contracts Entered into Prior to Mutual Release, ECF No. 220**

In its third and final motion in limine, Norfolk Southern contends that the mutual release executed by the parties in January 2010 in the course of settling <u>Norfolk Southern Railway Company v. Drummond Coal Sales, Inc.</u>, No. 7:08cv340 (W.D. Va.), bars any claims and the introduction of any evidence associated with contracts that could have otherwise been brought in the prior action. Specifically, Norfolk Southern asks the court to prohibit Drummond from introducing evidence or testimony in support of its prior material breach claim under C-9337 related to the rates and minimum volume commitments set forth in three Destination Contracts: C-9290, C-7545, and C-9289. Drummond indicated that it has "no intention of relying on C-9289 as forming the basis of its prior material breach claim" unless needed to respond to some argument or issue raised by Norfolk Southern at trial. ECF No. 241, at 3. Nevertheless, Drummond asks the court to deny Norfolk Southern's motion as to evidence of C-9290 and C-7545. To provide context for this ruling, certain relevant facts are repeated below.

### A.

More than a decade ago, the parties to this case entered into a contract pursuant to which Norfolk Southern agreed to haul for Drummond certain coal products by rail from

Charleston, South Carolina to various Destinations. In May 2008, Norfolk Southern filed suit against Drummond alleging breach of contract under C-9337, seeking payments for shortfall fees and for infrastructure improvements, each of which was required by C-9337. The undersigned, then a United States Magistrate Judge, conducted a settlement conference on December 14, 2009, at which the parties reached a resolution of their dispute. The resolution was memorialized in a settlement agreement, pursuant to which Drummond agreed to pay Norfolk Southern a certain sum and the parties agreed to amend various provisions of C-9337 and extend the contract term through 2019. The parties also executed a mutual release, and further agreed that any disputes concerning the terms of the settlement agreement would be resolved by the undersigned.

The question presented in Norfolk Southern's motion is whether the parties' mutual release operates as a waiver of all claims connected with C-9290 and C-7545 and, relatedly, Drummond's right to introduce evidence of these contracts in support of its prior material breach claim under C-9337. In other words, this motion requires the court to determine the scope of the mutual release. The release, executed on January 14, 2010, in relevant part, states that Drummond releases Norfolk Southern:

> from all claims, demands, debts, causes of action, or obligations of any kind whatsoever, known or unknown, arising or accruing from the beginning of time to the Effective Date of this mutual release, and arising out of the formation or performance of the Contract, including but not limited to all claims, defenses or avoidances made or asserted in the Action, and all claims, defenses or avoidances that could have been made or asserted in the Action.

ECF No. 249 (Ex. B). Norfolk Southern argues that the mutual release is a "general release from all claims or causes of actions, including unknown ones, arising out of the formation or

performance of C-9337 and before January 14, 2010." ECF No. 221, at 3. Further, Norfolk Southern claims that because the court ruled that the Destination Contracts, including C-9290 and C-7545, invariably implicated Norfolk Southern's performance under C-9337, the release must similarly be construed to reach and waive claims related to these contracts. Id. Norfolk Southern also asserts that even though C-9290 and C-7545 are only being used in support of the breach of contract cause of action under C-9337, as opposed to being asserted independently, the broad language of the release nevertheless bars their use in this manner. See ECF No. 221, at 5 n.4 (citing Mississippi Power & Light Co. v. United Gas Pipe Line Co., 729 F. Supp. 504, 507 (S.D. Miss. 1989) ("The terms used in the release—"obligations, demands, rights, claims, right of action, remedies"—clearly evidence an intent to cover something broader than a mere cause of action.")).

The Destination Contracts presently at issue, C-9290 and C-7545, were originally entered into on July 1, 2009 (although not executed until November 11, 2009) and April 5, 1989, respectively, each before the date of mutual release on January 14, 2010. Drummond contends that because (1) C-9290 and C-7545 were subsequently amended and/or had their terms extended after the date of the parties' release, and because (2) Norfolk Southern's failed to disclose C-9290 or C-7545 in the parties' prior litigation, Drummond should not be held to have waived any claims related to these two Destination Contracts. See ECF No. 245, at 3-7. Drummond further asserts that in its disposition of Norfolk Southern's motion for summary judgment, the court "implicitly rejected," ECF No. 263, at 61, the argument for excluding C-9290 and C-7545 which Norfolk Southern makes here. The court, however, did not specifically address or rule definitively on the applicability of the mutual release to C-9290 and C-7545.

See ECF No. 181, at 8 n.5 (noting generally that the Destination Contracts overlap the relevant term of C-9337 "in some respect").[5]

## B.

With respect to C-7545 specifically, Drummond claims that since the date of the mutual release, the term of C-7545 has been "extended at least once for an additional 5 years pursuant to § 3 of that Destination Contract." ECF No. 245, at 3 (citing ECF No. 76-1 at § 3). Drummond asserts that the effect of this extension was to eviscerate its ability to supply coal to the Clover plant under C-9337 for an additional period of time after the parties executed the mutual release in January 2010, and that "[a]bsent the extension of C-7545, the 90% minimum volume commitment would have ceased to exist." Id. Drummond relies on two amendments as the basis for its opposition to Norfolk Southern's motion: Amendment 1, ECF No. 132-26, at 12, and Amendment 2, ECF No. 132-26, at 2.

Norfolk Southern asserts that the fact that C-7545 and C-9290 have been amended on various occasions after the effective date of the release is irrelevant to the issue of waiver because all of Drummond's "claims" with respect to these Destination Contracts existed before the January 2010 release and could have, but were not, brought in the prior action. ECF No. 221, at 4. Indeed, Norfolk Southern avers that at all times since the effective date of C-7545 and C-9290, which preceded the mutual release, "the relevant contractual terms have been the same." Id.

---

[5] Drummond notes that regardless of whether the mutual release is held to apply to C-9290 or C-7545, its prior material breach claim has "clear merit" given the other Destination Contracts between Norfolk Southern and the Utilities "indisputably" entered into and/or amended after the parties' executed the mutual release. ECF No. 245, at 7 n.3.

As to C-7545, Norfolk Southern asserts that none of the amendments executed after the mutual release altered the "bases" of Drummond's claims under this contract. Norfolk Southern notes, for example, that at all times since the effective date of C-7545, the following have been true: (1) the minimum volume commitment was at least ninety (90) percent, (2) there has been no rate listed in the contract from the Charleston Shipyard River Terminal to the Clover plant, and (3) shipments made pursuant to C-9337 would not have counted towards the C-7545 volume commitment. ECF No. 221, at 6 (citing ECF No. 76-1). Norfolk Southern claims, therefore, that because these claims could have been brought in the original action, Drummond waived those claims when it executed the January 2010 release.

## C.

With respect to C-9290, Drummond notes that since the date of the mutual release, the terms of C-9290 have been amended at least four times. Drummond contends that since these amendments pertain to rail rates, minimum volume requirements, and liquidated damages provisions in C-9290, and postdate the January 2010 release, they supply it with new bases for claims under C-9337.

Norfolk Southern again argues that as with C-7545, the relevant contractual terms of C-9290 have been the same at all times since the effective date of this contract, i.e., July 1, 2009. Specifically, Norfolk Southern notes that (1) rates in C-9290 from the Charleston Shipyard River Terminal to Roxboro and Mayo have been higher than the rates under C-9337, (2) C-9290 failed to provide a rate between the Charleston Shipyard River Terminal and Asheville, (3) the minimum volume commitment in C-9290 has been ninety-five (95) percent at every Destination except for Asheville, which was eighty-five (85) percent, and (4)

shipments made pursuant to C-9337 would not have counted towards the C-9290 volume commitment. ECF No. 221, at 4-5 (citing ECF No. 76-6). Again, Norfolk Southern claims that since the amendments to C-9290 after the release did not alter the "bases" for Drummond's claims, and since Drummond could have brought those claims in the original action, those claims were "waived" in accordance with the release. ECF No. 221, at 5.

## D.

The narrow question presented in this motion is whether the alleged post-release amendments to C-7545 and C-9290 give rise to new claims and/or causes of action upon which Drummond may rely in the present action. In Virginia, "[t]he scope of a release agreement, like the terms of any contract, is generally governed by the expressed intention of the parties." First Security Federal Savings Bank, Inc. v. McQuilken, 253 Va. 110, 113, 480 S.E.2d 485, 487 (1997)). "Where parties contract lawfully and their contract is free from ambiguity or doubt, the agreement between them furnishes the law which governs them." Charles E. Russell Co., Inc. v. Carroll, 194 Va. 699, 703, 74 S.E.2d 685, 688 (1953).

There is little doubt that any claim and/or cause of action arising or accruing prior to the parties' execution of the mutual release in January 2010 is barred by the express terms of the release. It is equally clear, however, that the release only applies to "all claims, demands, debts, causes of action, or obligations" which existed on the effective date of the mutual release. In other words, the release is not a prospective waiver of the right to sue for subsequent violations of C-9337 as amended. The question then, contrary to Norfolk Southern's characterization, is not whether the post-release amendments "resurrect" or

"revive" old claims and/or causes of action, but whether they give rise to entirely new claims or causes of action.

In its opposition to Norfolk Southern's motion, Drummond cites <u>Richfood, Inc. v. Jennings</u>, 255 Va. 588, 499 S.E.2d 272 (1998), a case in which the Supreme Court of Virginia held that claims based on conduct that occurred after the execution of a general release were not discharged despite the fact that the conduct in question was "connected with . . . matters referred to in the [general] [r]elease." <u>Id.</u> at 591, 499 S.E.2d at 275. In <u>Richfood</u>, the plaintiffs, a food distributor and its wholly-owned subsidiary insurance company, brought an action seeking the reimbursement of insurance premium refund proceeds from several former shareholders of a grocery store corporation, of which the food distributor had also been shareholder, following the sale of the grocery store corporation. In the course of selling the grocery store corporation, the parties executed a general release discharging the defendants and their agents from, <u>inter alia</u>, all claims and/or causes of action, known or unknown, based upon or in connection with any relationship or dealings involving the grocery store. <u>Id.</u> at 590, 499 S.E.2d at 274. Several months after the sale and execution of the general release, a portion of the grocery store's prepaid insurance premiums were refunded to the defendants, who refused to return it to the plaintiffs.

The question presented in <u>Richfood</u> was whether the plaintiffs' claim was barred by the release. The Supreme Court of Virginia first noted that the general release, much like the mutual release at issue in the present case, covered only claims that accrued prior to its execution. <u>Id.</u> at 592, 499 S.E.2d at 275. In other words, the general release was not forward looking, <u>i.e.</u>, did not discharge claims not in existence or arising out of conduct or events that

had not occurred on or before the date of the release in question. In overruling the Virginia circuit court, the Supreme Court of Virginia observed that the "alleged wrongful conduct giving rise to the claim . . . asserted by [plaintiffs] against [defendants] did not transpire before the execution of the [release]." Id. While the plaintiffs and defendants may have known "that there would be a premium refund from the workers' compensation insurance carrier," the alleged wrongful conduct, i.e., the retention by the defendants of the insurance refund, occurred after the parties executed the general release. Id.

Norfolk Southern cites, albeit for a slightly different purpose, Noell Crane Sys. GmbH v. Noell Crane & Serv., Inc., 677 F. Supp. 2d 852 (E.D. Va. 2009), in support of its contention that the mutual release precludes Drummond from buttressing its claim under C-9337 by referring to or offering evidence of C-7545 and C-9290. In that case, Noell Crane, the plaintiff crane manufacturer, brought an action against NCSI, the defendant crane vendor, alleging that NCSI violated the parties' prior settlement agreement by filing a cross-complaint against it in a state-court action brought by a third party against NCSI.

The dispute between Noell Crane and NCSI originally involved, inter alia, claims of trademark infringement. In settling that dispute, the parties entered a full and final release of all claims, wherein NCSI discharged Noell Crane from all claims and/or causes of action resulting from conduct from the "beginning of time up through and including March 28, 2006." Id. at 858. Shortly before the parties entered the release on March 28, 2006, Noell Crane, among others, was sued in California state court in a personal injury action arising out of a 2005 accident. The personal injury action involved a crane manufactured by Noell Crane and sold by NCSI. NCSI was ultimately added as a defendant in the personal injury action. In

2007, NCSI filed a cross-complaint against Noell Crane alleging, inter alia, that Noell Crane owed NCSI indemnity.

The district court first held that the general release executed by NCSI barred any claim against Noell Crane based upon any "conduct, action, error or omission" occurring before March 28, 2006. Id. at 869. Consequently, the court held that because the indemnity agreements and the accident which served as the bases for NCSI's cross-complaint were formed and/or occurred in 2000 and 2005, respectively, prior to the execution of the release, the clear and unambiguous terms of the release barred NCSI from relying upon either in its cross-complaint. Id. at 870. Indeed, the court held that "the actions which gave rise to any indemnity rights that NCSI meant to exercise through the cross-complaint, or the actions that purportedly amounted to fraud and deceit by Noell Crane, all occurred prior to March 28, 2006, including the execution of the indemnity agreements (July 2000) and the actual accident . . . (May 17, 2005)." Id. at 870. In short, the court concluded that "[t]his is not a case where post-release claims arose out of post-release conduct," as all the actions alleged by NCSI occurred prior to March 28, 2006. The court therefore held that the bases for NCSI's cross-complaint unquestionably fell within the scope of the release.

Taken together, these cases stand for the proposition that where a release applies only to claims and/or causes of action accruing or conduct occurring before its execution, post-release conduct giving rise to post-release claims may serve as a basis for post-release litigation. These same cases also illustrate the difficulty in categorizing conduct as either pre or post-release and determining whether such conduct gives birth to new claims. Here, it is plainly the case that in asserting its prior material breach claim under C-9337, Drummond may not rely

on any alleged claim and/or cause of action related to C-7545 or C-9290 that could have been brought prior to the execution of the mutual release in January 2010.[6] However, determining whether the post-release amendments created new claims and/or causes of action falling outside the scope of the release requires a thorough understanding of their terms. The court will proceed by addressing each of the proffered amendments to C-7545 or C-9290.

## E.

The two amendments at issue with respect to C-7545, Amendment 1, ECF No. 132-26, at 12, and Amendment 2, ECF No. 132-26, at 2, were executed on July 1, 2001 and August 19, 2011 (effective September 1, 2011), respectively. The original contract was executed on April 5, 1989 between Norfolk Southern and Virginia Electric Power Company, doing business in Virginia as Dominion Virginia Power. See ECF No. 132-26, at 81.

Amendment 1 to C-7545 adjusts the "effective rate for private cars" under the "CSXT Interchange" through Glasgow, Virginia. Id. That the amendment was signed long before the execution of the mutual release in January 2010 suggests, at least preliminarily, that any claims and/or causes of action arising out of this specific amendment were waived. Drummond, however, asks the court to preclude Norfolk Southern from invoking the release because Norfolk Southern allegedly failed to disclose C-7545 in the parties' prior litigation. Drummond asserts that as a result of this failure to disclose, it "was not aware of the existence or terms" of this contract at the time it signed the release. ECF No. 245, at 5. Drummond further claims that this failure to disclose engendered a failure of consideration, wherein "Norfolk Southern

---

[6] The release bars "all claims, demands, debts, causes of action, or obligations of any kind whatsoever" "arising or accruing" prior to the effective date of the release, "arising out of the formation or performance" of the contract, claims "made or asserted" in the prior action, and claims that "could have been made or asserted" in the prior action.

simply accepted tens of millions of dollars . . . without disclosing that the value of the consideration received by Drummond in exchange for this payment – an extension of C-9337 and the guaranteed, calculable rates therein – had already been materially altered to [its] direct detriment." Id. at 6 (citing 66 Am. Jur. 2d Release § 15 ("Where a release has to be supported by consideration, a failure of consideration will result in the voiding of the release and may affect such things as judgments or causes of action that were barred by the release.")).

Norfolk Southern correctly notes that whether Drummond was "aware" of the existence or terms of C-7545 when it executed the release is irrelevant given that the release plainly encompassed both "known or unknown" claims and accounted for the risk that the latter exist. Indeed, here, as in Noell Crane, where the release at issue similarly included a "known or unknown" clause:

> [I]t is apparent to the court that the parties specifically agreed to absorb the risk of having "inferior knowledge" by agreeing to release any and all claims, regardless of whether the claims were "known or unknown." For that clause to have any significance, the parties have to assume, or at least bear the risk, that there are existing, unknown claims at the time they enter into the agreement.

677 F. Supp. 2d at 873–74; see Richfood,, 255 Va. at 593, 499 S.E.2d at 272 (holding that release language· which discharged liability for "any and all claims . . . whether known or unknown, based upon arising out of or connected with anything whatsoever done, omitted or suffered to be done" unambiguously forbade claims arising out of conduct or events that occurred on or before the date of the release agreement); see also Crosswhite v. Mid–Mountain Foods, Inc., No. 3667, 1987 WL 488612 (Va. Cir. March 9, 1987) (finding that a release from "any and all liability . . . for any and all claims, . ... whether known or unknown, arising out of,

resulting from, or related to any" past conduct, "containing broad, general language of release, entered into by competent parties, at arm's length, with the advice of counsel clearly evinces an intent by the parties to sever the relationship once and for all and to preclude any future claims"). Drummond assumed the risk that there were claims related to Norfolk Southern's contracting with the Utilities of which it was unaware and, in electing to execute the release, relinquished its right to those unknown claims in favor of resolving the litigation pending at that time.

Norfolk Southern also correctly notes that Drummond did not specifically assert that any alleged "failure to disclose" constituted a specific discovery violation or was enough to support a free-standing fraud in the inducement claim. Drummond simply asserts that it was "not aware" of the existence or terms of C-7545 or C-9290 because Norfolk Southern failed to disclose these contracts. While Virginia law is clear that mutual releases can be rescinded for fraud in its inducement and/or "concealment" through the omission of material facts, see Metrocall of Del. v. Continental Cellular, 246 Va. 365, 374, 437 S.E.2d 189, 193–94 (1993); Allen Realty Corp. v. Holbert, 227 Va. 441, 450, 318 S.E .2d 592, 597 (1984), it is equally clear that such allegations must be specifically alleged. In Noell Crane, for example, the court upheld the challenged release (discussed above) in the face of an expressly pleaded fraud in the inducement claim, holding that "[r]egardless of the theory of fraud, the elements and facts in support of fraud must be pled with particularity," and that "weakly substantiated" and/or "[c]onclusory statements are insufficient to establish . . . fraud." 677 F. Supp. 2d at 871–72. The court further observed that NCSI did not identify sufficient evidence to establish that

Noell Crane possessed fraudulent intent or, relatedly, a duty to disclose the existence of the personal injury action, i.e., the supposedly concealed information, at issue in that case. Id.

Drummond has offered no more, and indeed, far less, than that provided by NCSI in Noell Crane in support of its failure to disclose allegation. Crucially, Drummond has failed to identify a specific duty or obligation on the part of Norfolk Southern which required it to disclose C-7545 (or C-9290) during the prior litigation and/or settlement, and "[i]t is well-settled in Virginia law that a duty to disclose information does not normally arise when the parties are engaged in an arm's length transaction." See Noell Crane, 677 F. Supp. 2d at 872 (citing Costello v. Larsen, 182 Va. 567, 29 S.E.2d 856 (1944) (holding that "plaintiff was dealing with defendant at arm's length [and, therefore,] it was the duty of plaintiff to make inquiry in regard to the true status of affairs")). Norfolk Southern represents that Drummond's discovery requests did not implicate C-7545, as Drummond only requested Norfolk Southern contracts with certain Destinations, which did not include the Clover plant. See ECF No. 221, at 8; id. at 873 (noting that "[c]ertainly the law cannot impose a burden to disclose information in an arm's length transaction, in the event that the information might, at some point in time, be relevant to the other party who is represented by counsel and not at any disadvantage in bargaining power").

Drummond further asserts, albeit in a cursory fashion, that Norfolk Southern's failure to disclose that "Drummond's rate during the extended term of C-9337 to the Clover plant was actually worthless due to C-7545's minimum volume requirement" invalidates the release on failure of consideration grounds. Virginia, however:

> [F]ollow[s] the 'peppercorn' theory of consideration," under
> which even the most picayune promise may be enough to make

41

an agreement binding. <u>Sfreddo v. Sfreddo</u>, 59 Va. App. 471, 720 S.E.2d 145, 153 (2012). Consideration can take the form of a benefit bestowed or a detriment endured. <u>Brewer v. First Nat'l Bank of Danville</u>, 202 Va. 807, 120 S.E.2d 273, 279 (1961). Even a "slight advantage" or a "trifling inconvenience" can suffice. R.K. Chevrolet, Inc. v. Hayden, 253 Va. 50, 480 S.E.2d 477, 480 (1997). Whatever the form, consideration is "the price bargained for and paid for a promise." <u>Brewer</u>, 120 S.E.2d at 279.

<u>JTH Tax, Inc. v. Aime</u>, 744 F. App'x 787, 791 (4th Cir. 2018), <u>cert. denied</u>, 139 S. Ct. 855, 202 (2019); <u>see</u> <u>ESCgov, Inc. v. BMC Software</u>, Inc., No. 1:13-CV-1344 GBL/TCB, 2014 WL 3891660, at *5 (E.D. Va. Aug. 7, 2014), <u>aff'd</u>, 597 F. App'x 181 (4th Cir. 2015) ("Where a promisor receives and accepts, in exchange for his promise, 'something which he was not previously entitled to receive,' it is 'adequate consideration to support the promise,' even if it is 'but a peppercorn.'").

Norfolk Southern persuasively argues that the mutual release was supported by far more than a notional "peppercorn," and that the benefits accruing to Drummond from its execution were manifold. Norfolk Southern notes, for example, that among the benefits bestowed on Drummond and detriments incurred by it in exchange for the mutual release include a reduction in Drummond's minimum volume commitment in C-9337 and an increase of the refund amount payable to Drummond by Norfolk Southern. <u>See</u> ECF No. 249-2 (Sealed). Insofar as Drummond elected to pay shortfall fees to Norfolk Southern in each of the years from 2010 to 2014, and to the extent those fees were substantially less than it otherwise would have paid, it cannot be said that the release was unsupported by consideration. The court would note that Drummond offered minimal argument and no evidence in support of its failure of consideration theory on brief and provided no argument

regarding the same at oral argument. Indeed, Norfolk Southern's contentions summarized above regarding consideration went entirely unrebutted.

Amendment 2, which was also executed after the mutual release, amends C-7545 by adding Article 25A, which relates exclusively to fuel surcharges. Drummond does not specifically allege that the fuel surcharge component of Amendment 2 itself gives rise to a new claim and/or cause action or otherwise supports its Article 13, Article 27, or Article 20 material breach claims. Rather, Drummond appears to assert that § 3 of Amendment 2 extended the term of C-7545 "for an additional 5 years pursuant to § 3 of that Destination Contract." ECF No. 245, at 3. Section 3 of C-7545, i.e., the durational clause of the Destination Contract, states, in relevant part:

> This Agreement shall continue in full force and effect for a period of twenty (20) years from December 21 of the year in which Coal Shipments are first received at Destination. The term of this Agreement shall be extended for up to two (2) consecutive additional five (5) year periods without additional action by either Party, provided that is ODEC gives notice that it does not desire such extension prior to the expiration of the original term of this Agreement or the expiration of the then current extension, such extension shall not occur.

ECF No. 132-26, at 54. Section 3 of Amendment 2 states, in full, that "[e]xcept as herein amended, the Agreement shall remain in full force and effect." Id. at 4. Given that the original contract was executed in April 1989, the first opportunity to extend C-7545 would presumably have been in April 2009, prior to the execution of the mutual release in January 2010. In other words, although Drummond appears to characterize § 3 of Amendment 2, executed in August 2011, as a post-release extension of C-7545, it is entirely unclear, and indeed, doubtful, that

the clause in question was intended to perform the alleged function.[7]

Insofar as the court can discern, Amendment 2 relates entirely to fuel surcharges, and § 3, i.e., the full force and effect clause, merely affirms that the remainder of C-7545 remains undisturbed and in effect. While the execution of Amendment 2 in August 2011 appears to suggest that C-7545 was at some prior point extended, it does not itself appear to represent, as Drummond appears to assert, that extension, or constitute post-release conduct relevant to Drummond's prior material breach claims. While it may be the case that the term of C-7545 was "extended at least once for an additional 5 years," neither Amendment 1 nor Amendment 2 provide the court with sufficient information to determine when that extension occurred. If the extension occurred in April 2009, when the plain language of § 3 of C-7545 suggests it would have occurred, then any claims and/or causes of action arising from that extension would be barred by the January 2010 release. Neither amendment nor any argument proffered in opposition to Norfolk Southern's motion provides a basis for a post-release claim: Amendment 1 was executed prior to the release, and the subject matter of Amendment 2 is orthogonal to Drummond's C-9337 claims. Norfolk Southern's motion is therefore **GRANTED** as to C-7545.

**F.**

---

[7] Norfolk Southern appeared to believe that Drummond was referring to § 3 of C-7545, rather than § 3 of Amendment 2. If indeed this is what Drummond intended, Norfolk Southern's characterization of that durational clause as a self-executing evergreen provision is plainly correct. That clause was contained in the original contract. Under Noell Crane, any claims for relief related to the extensions contained in this clause, prospective or otherwise, existed prior to the execution of the mutual release in January 2010 and, accordingly, are barred by the release. Cf.

With respect to C-9290, Drummond claims that the following four post-release amendments give rise to new claims and/or causes of action: Amendment 1, ECF No. 132-31, at 25 (executed February 24, 2010); Amendment 2, id. at 12 (executed July 1, 2011); Amendment 3, id. at 9 (executed February 26, 2013); and Amendment 4, id. at 2 (effective January 1, 2014). The amended and restated contract was executed on July 1, 2009, between Norfolk Southern and Carolina Power and Light Company, doing business in Virginia as Progress Energy Carolinas, Inc. See ECF No. 132-32, at 28.

Amendment 1 to C-9290 contains three clauses, which, as described by Drummond "change some of the rate provisions in the contract," namely the Cape Fear base rates for the Kenova, Kanawha, Virginian origin district. ECF No. 245, at 4. Amendment 2, among other things, cancels Amendment 1 in its entirety and deletes the base rate provision of Article 13, replacing it with new rates set forth in an attached appendices section. Amendment 3 deleted and replaced Article 26, the minimum volume and liquidated damages provision of C-9290. The replacement provision included, inter alia, a ninety-five (95) percent minimum volume commitment at Roxboro and Mayo stations, an eighty-five (85) percent volume commitment at Asheville, and a 1,125,000-ton minimum requirement from the Waynesburg and Fairmont districts. Lastly, Amendment 4 yet again replaced the base rates set forth in Article 13.

The question is whether the above-referenced amendments, all which were executed after the mutual release, individually or in concert, constitute post-release conduct giving rise to new, post-release claims to which Drummond may refer in arguing its Article 13 claim. Drummond asserts that these post-release amendments unequivocally give rise under Richfood to new causes of action to which it might cite in support of its material breach claims.

Norfolk Southern asserts that Richfood is inapposite to the facts of this case because the amendments made to C-9290 (and C-7545) after the effective date of the mutual release "did not alter the bases for Drummond's claims." ECF No. 249, at 3. Richfood, however, does not hold that so long as the "bases" are the same or similar between claims accruing before and after the execution of a release, the post-release claim is barred because a similar pre-release claim could have been brought but was not. Richfood was concerned with when the conduct allegedly giving rise to a post-release claim occurred.

Here, as in Richfood, the conduct in question, namely Norfolk Southern's amendments to C-9290, occurred after the execution of the mutual release in January 2010. See Norfolk S. Ry. Co. v. Drummond Coal Sales, Inc., No. 7:08CV00340, 2016 WL 4532411, at *8 (W.D. Va. Aug. 29, 2016) (holding that because several counts of the complaint are premised on circumstances alleged to have occurred after the parties' settlement of the instant breach of contract case, "they do not directly implicate . . . the scope or construction of the [m]utual [r]elease"). Further, unlike Amendment 2 to C-7545, the substance of the amendments to C-9290, especially those related to the minimum volume requirement and liquidated damages provision in Amendment 3, are of the sort explicitly alleged by Drummond to have impaired its ability to use the schedule of rates set forth in Article 13 of C-9337. Clearly, a similar claim based on the original terms of C-9290, including the minimum volume and liquidated damages provision (Article 26), is barred per the mutual release and for the reasons discussed above with respect to C-7545. Those claims arose and/or accrued prior to the mutual release, and, therefore, as stated in the release, "could have been made or asserted" in the prior action. ECF No. 249 (Ex. B). However, the execution of subsequent amendments after the release date

modifying and/or reimposing the volume requirement and liquidated damages provision constitutes discrete post-release conduct for which a new, albeit substantively similar, claim potentially exists. In short, unlike <u>Noell Crane</u>, this is a case where alleged post-release claims arose out of post-release conduct. It is not the case that the post-release amendments discussed above "resurrected," <u>see</u> ECF No. 249, at 4, waived claims so much as they potentially gave birth to new ones. <u>Cf.</u> <u>Norfolk S. Ry. Co.</u>, 2016 WL 4532411, at *7 (noting that although Count I may reference the Amended Contract, the allegations plainly concern terms found in the original 2006 Transportation Contract, "not provisions that were amended or added in 2010"). For the foregoing reasons, Norfolk Southern's motion as to C-9290 is **DENIED**. Drummond may rely upon the post-release amendments to C-9290 in support of its Article 13 claim under C-9337.[8]

It is **SO ORDERED**.

Entered: 07-22-2019

/s/ Michael F. Urbanski

Michael F. Urbanski
Chief United States District Judge

---

[8] For the same reasons that the court found the failure to disclose and failure of consideration arguments unavailing as to C-7545, it finds them equally unavailing as to C-9290. Thus, C-9290 may be relied upon to the extent the terms of the amendments only form the basis of Drummond's claims.