CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

SEP 04 2019

JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| DRUMMOND COAL SALES, INC., ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 7:16-cv-489 |
| ) | |
| v. ) | |
| ) | By: Michael F. Urbanski |
| NORFOLK SOUTHERN RAILWAY ) | Chief United States District Judge |
| COMPANY, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

The matter presently before the court is Norfolk Southern Railroad Company's ("Norfolk Southern") motion for clarification, ECF No. 274, of the court's ruling on its third motion in limine, ECF No. 220, to exclude evidence relating to transportation contracts entered into prior to the execution of a January 2010 mutual release between it and Drummond Coal Sales, Inc. ("Drummond"). Norfolk Southern seeks clarification of two aspects of the court's July 22, 2019 memorandum opinion, ECF No. 267, granting in part and denying in part its motion, namely: (1) "[w]hether the [c]ourt's ruling with respect to C-9290 excludes evidence and argument relating to <u>rates</u> that were <u>unchanged</u> by post-release amendments"; and (2) "[w]hether the [c]ourt's ruling with respect to C-9290 excludes evidence and argument relating to <u>volume commitments</u> that were <u>unchanged</u> by post-release amendments." ECF No. 274, at 1.

I.

In its original motion in limine, ECF No. 220, Norfolk Southern asserted that the mutual release executed by and between the parties in January 2010 in the course of settling

1

Norfolk Southern Railway Company v. Drummond Coal Sales, Inc., No. 7:08cv340 (W.D. Va.), barred certain claims and the introduction of any evidence associated with Destination Contracts that could have been brought in that prior action.[1] The release in question, executed on January 14, 2010, states, in relevant part, that Drummond releases Norfolk Southern:

> from all claims, demands, debts, causes of action, or obligations of any kind whatsoever, known or unknown, arising or accruing from the beginning of time to the Effective Date of this mutual release, and arising out of the formation or performance of the Contract, including but not limited to all claims, defenses or avoidances made or asserted in the Action, and all claims, defenses or avoidances that could have been made or asserted in the Action.

ECF No. 249 (Ex. B). Norfolk Southern asserted that the mutual release should be construed to preclude Drummond from introducing evidence or testimony related to the rates and minimum volume commitments set forth in three Destination Contracts: (1) C-9290, (2) C-7545, and (3) C-9289. The present motion concerns only C-9290, which was executed on July 1, 2009, and subsequently amended at least four times after the execution of the mutual release in January 2010: Amendment 1, ECF No. 132-31, at 25 (executed February 24, 2010); Amendment 2, id. at 12 (executed July 1, 2011); Amendment 3, id. at 9 (executed February 26, 2013); and Amendment 4, id. at 2 (effective January 1, 2014) (hereinafter, collectively, "Amendments").

## A.

With respect to C-9290, the question presented in Norfolk Southern's third motion in limine was whether the parties' mutual release operated as a waiver of all claims connected

---

[1] Destination Contracts refers to Norfolk Southern's separate contracts with the Utilities that "own(ed) and operate(d) the Destinations in the Appendices to C-9337." ECF No. 10, at 1.

with C-9290 and, relatedly, Drummond's right to introduce evidence of this Destination Contract in support of its prior material breach claim under C-9337. Drummond argued that because the aforementioned Amendments pertain to rail rates, minimum volume requirements, and liquidated damages provisions in C-9290, as well as postdate the January 2010 release, they supply it with new bases for claims under C-9337 which fall outside the scope of the release. Norfolk Southern argued that the post-release Amendments do not give rise to new claims because all the ostensibly new "claims" existed under and related back to the original terms of C-9290, and could have, but were not, brought in the prior action. ECF No. 221, at 4. Norfolk Southern averred that at all times since the effective date of C-9290, "the relevant contractual terms have been the same." Id.

In its July 22, 2019 memorandum opinion, ECF No. 267, the court first noted that there is little doubt that any claim and/or cause of action arising or accruing prior to the parties' execution of the mutual release in January 2010 is barred by the express terms of the release. The court also noted, however, that it is equally clear that the release only applies to "claims, demands, debts, causes of action, or obligations" which existed prior to the effective date of the mutual release. In other words, the release was held not to be a prospective waiver of the right to sue for subsequent violations of C-9337 which occurred after January 14, 2010. The court, relying on the Richfood, Inc. v. Jennings, 255 Va. 588, 499 S.E.2d 272 (1998) and Noell Crane Sys. GmbH v. Noell Crane & Serv., Inc., 677 F. Supp. 2d 852 (E.D. Va. 2009), observed that the "execution of subsequent amendments after the release date modifying and/or reimposing the volume requirement and liquidated damages provision [to C-9290] constitutes discrete post-release conduct for which a new, albeit substantively similar, claim

3

potentially exists." ECF No. 267, at 47.[2] The court noted that "unlike in Noell Crane, this is a case where alleged post-release claims arose out of post-release conduct," and as such, "C-9290 may be relied upon to the extent the terms of the amendments only form the basis of Drummond's claims." ECF No. 267, at 47. In its discussion of C-7545, the court also held that certain post-release conduct, such as the extension of a contract, which was clearly provided for in a self-executing term contained in the original contract, does not provide grounds for a post-release claim.

In C-7545, for example, § 3, the durational clause, states that the "term of this Agreement shall be extended for up to two (2) consecutive additional five (5) year periods without additional action by either [p]arty . . . ." Given that § 3 of C-7545 provides for future extensions of C-7545, a post-release amendment merely memorializing such an extension provided for in the original contract would not give rise to a post-release claim under the broad language of the mutual release. In its motion for clarification, Norfolk Southern asserts that as with a hypothetical extension of C-7545 pursuant to § 3 of that contract, the rate changes in the post-release Amendments to C-9290 "merely reflected the previously existing rates as escalated pursuant to [C-9290's] original terms." ECF No. 275, at 2. For this reason, Norfolk Southern asserts that the "putative" rate changes represent changes of "form rather than substance," and therefore do not alter the underlying payment obligation provided for in the original terms of C-9290. To illustrate its argument further, Norfolk Southern provided the following hypothetical. Norfolk Southern states that if a hypothetical transportation contract

---

[2] Taken together, Richfood and Noell Crane stand for the proposition that where a release applies only to claims and/or causes of action accruing or conduct occurring before its execution, post-release conduct giving rise to post-release claims may serve as a basis for post-release litigation.

4

were to provide for a base rate of $100 in year one, to be escalated annually by 10%, then the rate after year five would be $181.55. Thus, if the parties were to replace – in year five – the contract's original rate provision of "$100 in year one, to be escalated annually by 10%" with a rate provision that provided for a rate of $181.55, there would be no change to the contract's original rate because the substantive payment obligation of the contracting party remains the same. Norfolk Southern asserts that "[t]his is precisely what happened with the post-release amendments to C-9290 as they relate to the relevant Shipyard [River] Terminal [('SRT')] rates."

Norfolk Southern notes that pursuant to the Adjustment Clause of Article 14 in C-9290, the base rates found in Appendix A are adjusted quarterly based upon an index published by the Association of American Railroads, plus a 5% increase after the adjustments of July 1, 2010, 2013, and 2016.[3] Norfolk Southern asserts that although the base rates listed in Amendment 4 for shipments from SRT to Roxboro and Mayo ($28.38 for rapid trainload and $29.62 for all others) appear higher than the base rates for such shipments listed in Amendment 2 ($23.17 for rapid trainload and $24.17 for all others), the Amendment 4 rates merely represent the rates that would have otherwise been in effect at the time of the

---

[3] Article 14, Adjustment Clause.
  (a) The base transportation rates in Appendices A - D, as well as Incentive Refunds listed in Refunds listed in Article 30 and the Private Car Refund listed in Article 31 (individually and collectively the "Refunds"), shall be adjusted quarterly, upward or downward, as applicable, on each January 1, April 1, July 1, and October 1 during the Term by the All-Inclusive Index, Less fuel (AII-LF) published by AAR, but shall not be adjusted below the Base Rate or the Revised Base Rates, or below the Base Refund or Revised Base Refund, whichever is then applicable. The first adjustment shall occur on July 1, 2009. The "Base Rates" are those rates in Appendices A - D shown in this Amendment 1 and the Base Refunds are the Refunds shown in Articles 30 and 31 of this Amendment 1. The result of each such adjustment will be rounded to the nearest cent. Subsequent adjustments shall be made to the then-current rates and refunds. NS or PEC, as applicable, will refund the difference, if any, between (i) the transportation rates paid by PEC between July 1, 2009 and the date on which the parties execute this Amended Contract and (ii) the Base Rates; as adjusted, pursuant to this Amended Contract.
  (b) In addition to the quarterly adjustments described in Article 14(a), immediately following the rate adjustments on July 1 of each of 2010, 2013 and 2016, the then-current transportation rates and refunds shall increase by 5% and shall become the "Revised Base Rates" and "Revised Base Refunds." Quarterly adjustments pursuant to Article 14(a) shall continue through the end of the Term.

5

amendment, pursuant to the Article 14 escalation provision calling for quarterly adjustments. Norfolk Southern also notes that although Amendment 2 purported to replace all the base rates in C-9290, it left unchanged the original, pre-release base rates for shipments from the SRT to Roxboro and Mayo.[4] Norfolk Southern further notes that the only distinction between the manner in which the original base rates were reflected in Amendment 2 and in Amendment 4 is that the text of Amendment 2 contained the applicable escalation language[5], whereas Amendment 4 "baked the same escalation language and calculations into the numbers themselves shown [in] the Appendices." ECF No. 275, at 3. In sum, Norfolk Southern claims that neither Amendment 2 nor Amendment 4 altered the base rates from the SRT to Roxboro and Mayo that would have otherwise been in effect, and as such, Drummond has failed to allege any wrongful conduct with respect to those rates that occurred after the date of the mutual release. Norfolk Southern argues that evidence of these rates, therefore, should be excluded under Richfood, Inc. v. Jennings, 255 Va. 588, 499 S.E.2d 272 (1998).

In Richfood, the Supreme Court of Virginia provided that post-release claims must be based upon post-release conduct:

> The alleged wrongful conduct giving rise to the claim now asserted by Richfood and Market Insurance against Jennings and Dembinski did not transpire before the execution of the Agreement. It may well be that Richfood and Market Insurance, as well as Dembinski and Jennings, knew that there would be a premium refund from the workers' compensation insurance carrier. However, in the present action, Richfood and Market

---

[4] The court reviewed the rates from SRT to Roxboro and Mayo contained in C-9290, ECF No. 132-31, at 48, against the rates for SRT to Roxboro and Mayo contained in Amendment 2, id. at 12, and confirmed that the original, prelease rates were unchanged.

[5] See ECF No. 132-31, at 14 (Am. 2) ("For the sake of clarity, the rates set forth in the attached Appendices do not reflect, but are subject to, the adjustments called for by Article 14(a) of the Contract on July 1 and October 1, 2009; January 1, April 1, July 1 and October 1, 2010; and January 1 and April 1, 2011; the adjustments called for by Article 14(b) of the Contract; as well as all future adjustments called for by the Contract beginning July 1, 2011 and continuing for the duration of the Contract's term.").

6

> Insurance allege that Jennings and Dembinski wrongfully retained that refund. This alleged conduct by Jennings and Dembinski occurred after Richfood initially received the refund check in May 1995, long after the parties executed the Agreement. Thus, we conclude that the provision of the Agreement at issue does not bar the claim asserted by Richfood and Market Insurance in this case.

Id. at 275. In Richfood, the alleged wrongful conduct by Jennings and Dembinski—receiving and failing to refund a check—occurred after the date of the mutual release. Id. Norfolk Southern argues that in this case, the alleged wrongful conduct—imposing rates to Roxboro and Mayo from the SRT that differ from Drummond's rates—occurred before the date of the mutual release. Norfolk Southern argues that if the situation here were applied to Richfood, the appropriate analogy would be if the parties had received the check prior to the date of the mutual release and then continued to withhold the refund following the date of the mutual release. Norfolk Southern argues that certainly, the Supreme Court of Virginia would have reached a different result in Richfood if the only allegedly wrongful post-release conduct in that case had been a continuation of the status quo. ECF No. 275, at 4.

Norfolk Southern claims that because there was no "substantive change" in the rates from the SRT to Roxboro or Mayo after the date of the mutual release, it would be "placing form over substance to rely on the restatement of the [SRT] rates in Amendment 4 as the basis for a post-release claim, when the rates found in that amendment simply reflected the escalation called for by the original contract." Id. at 4-5 (citing ECF No. 267, at 44 n.7 ("Under Noell Crane, any claims for relief related to the extensions contained in this ['self-executing evergreen provision'], prospective or otherwise, existed prior to the execution of the mutual release in January 2010 and, accordingly, are barred by the release.")). Norfolk Southern urges

7

the court to exclude Drummond from offering evidence and argument in support of its breach of contract claim that relies on the rates from the SRT to Roxboro and Mayo contained in the post-release Amendments because those rates are the "same as the rates called for by C-9290 prior to the release." ECF No. 275, at 5. Norfolk Southern also argues that Drummond should not be allowed to introduce evidence or argument related to the non-existence of a rate in the Amendments from the SRT to Asheville, as such was the case in the original version of C-9290 prior to the mutual release. Id. at 5 n.1

Drummond contends that despite Norfolk Southern's claim that none of the Amendments to C-9290 actually altered any of the rates to the SRT in that contract, Amendment 2, Amendment 3, and Amendment 4 "all substantively changed important aspects of C-9290," and all were executed after the parties' signed the mutual release in January 2010. ECF No. 280, at 2. With respect to C-9290's base rates, Drummond notes: (1) that Amendment 4 effectively reduced all of the rates in C-9290 by adding a "Volume Incentive Refund" of $1.00 per ton in 2014 and 2015, and $1.65 in 2016, 2017, and the first half of 2018; (2) that Amendment 2 "deleted in their entirety and replaced" the Appendices to C-9290 containing the rail rates, reducing the Illinois Basin ("ILB") and Northern Appalachian ("NAPP") rates between 7.5% and 15%; (3) that Amendment 2 changed all of the SRT rates applicable to smaller train sizes; and (4) that Norfolk Southern continued to exclude SRT from the Asheville rate. Drummond contends that Norfolk Southern's "purposeful decisions to change the rate schedules in C-9290 while renewing its . . . exclusion of SRT from the Asheville rate schedule are separate, actionable wrongs that occurred well after Drummond executed the [m]utual [r]elease." ECF No. 280, at 3. Lastly, Drummond asserts that Norfolk Southern's

8

motion improperly construes the Amendments to C-9290 in isolation, eliding the fact that Amendment 4 to C-9290 was signed contemporaneously with Amendment 4 to C-9545. Drummond asserts that those amendments were "part of a package deal" between Duke Energy Carolinas, LLC ("Duke") and Norfolk Southern that increased the minimum volume commitment at Duke's Marshall plant (a Destination in Appendix A to C-9337) from 25% to 95%, effectively rendering the Marshall plant "solely served by Norfolk Southern" and "eviscerating the value of Drummond's C-9337 rate to Marshall." ECF No. 280, at 4. Drummond contends that Norfolk Southern's internal documents "confirm that, in exchange for various refunds and rate reductions it gave to Duke . . . , Norfolk Southern specifically bargained for the reinstatement of the minimum volume commitments in C-9290." Id.

**B.**

With respect to Amendment 3 to C-9290, the court previously described its substance as follows:

> Amendment 3 deleted and replaced Article 26, the minimum volume and liquidated damages provision of C-9290. The replacement provision included, inter alia, a ninety-five (95) percent minimum volume commitment at Roxboro and Mayo stations, an eighty-five (85) percent volume commitment at Asheville, and a 1,125,000-ton minimum requirement from the Waynesburg and Fairmont districts.

The court also noted that:

> [T]he substance of the amendments to C-9290, especially those related to the minimum volume requirement and liquidated damages provision in Amendment 3, are of the sort explicitly alleged by Drummond to have impaired its ability to use the schedule of rates set forth in Article 13 of C-9337. Clearly, a similar claim based on the original terms of C-9290, including the minimum volume and liquidated damages provision (Article 26), is barred per the mutual release and for the reasons discussed above with respect to C-7545.

9

Norfolk Southern argues in the present motion that because two of the three minimum volume commitments cited by the court in Amendment 3, i.e., the 95% commitment for Roxboro and Mayo and the 85% commitment for Asheville, are "original terms of C-9290," Drummond may not rely on those terms in support of its Article 13 claim. In other words, Norfolk Southern asserts that Drummond should only be able to rely on the minimum volume commitment that was added by Amendment 3 to C-9290's original terms, i.e., the 1,125,000-ton commitment from the Waynesburg and Fairmont districts.

In sum, Norfolk Southern asserts that, as with Amendments 2 and 4, Amendment 3 did not substantively alter the minimum volume commitments to Roxboro, Mayo, and Asheville that would have "otherwise been in effect," and allowing evidence of such minimum volume commitments would conflict with Richfood, Inc. v. Jennings, 255 Va. 588, 499 S.E.2d 272 (1998), as well as the court's prior ruling that the mutual release bars Drummond's claims to the extent those claims concern terms found in the original contract. See Norfolk S. Ry. Co. v. Drummond Coal Sales, Inc., 2016 U.S. Dist. LEXIS 115485, 20-21 (W.D. Va. 2016) ("Count One may reference the Amended Contract, but Drummond's allegations plainly concern terms found in the original 2006 Transportation Contract – not provisions that were amended or added in 2010 . . . [and] [a]s such, Count One . . . is barred by Drummond's release."). Norfolk Southern notes that "[f]or simplicity in drafting, [it] opted to restate the entirety of Article 26 in Amendment 3, as opposed to formatting the amendment as an addition of the minimum volume commitment to the Waynesburg and Fairmont [d]istricts." ECF No. 275, at 7. Norfolk Southern avers that if it "had formatted the amendment as an addition instead of a replacement, then the volume commitments to Roxboro and Mayo would

have remained in place by virtue of the 'full force and effect' clause found in Section 4 of Amendment 3." Id. at 8. Norfolk Southern argues that it cannot be the case that the choice of whether to type out the text of the volume commitments or to rely upon the full force and effect clause is the allegedly wrongful conduct giving rise to a post-release claim. Norfolk Southern notes that the court already found that reaffirming existing obligations found in the original contract through a full force and effect clause did not give rise to a post-release claim. Id. (citing ECF No. 267, at 44).

Drummond argues that although Norfolk Southern dismisses Amendment 3 as simply restating terms from Article 26 of C-9290, rather than imposing new commitments, the amendment "added a new minimum volume requirement from NAPP origins, and it also removed the minimum volume requirements for Cape Fear and Lee plants," both of which were Destinations in Drummond's contact (C-9337). Further, Drummond asserts that Norfolk Southern also "made the deliberate decision to reinstate the minimum volume requirements applicable to Roxboro and Mayo plants to exclude SRT . . . as an origin with respect to the Asheville plant." ECF No. 280, at 3. Drummond claims that "[a]s with Amendments 2 and 4, Norfolk Southern's purposeful decision to delete and reinstate those minimum volume requirements and exclude SRT from the Asheville rate schedule constitutes a separate, actionable wrong that occurred after Drummond executed the mutual release." Id. at 4.

## C.

Norfolk Southern notes that it does not oppose Drummond's introducing evidence and argument relating <u>solely</u> to the post-release changes to C-9290 flagged by Drummond,

11

including the: (1) addition of a "Volume Incentive Refund" in Amendment 4; (2) alteration of rates from origins other than SRT, including the ILB and NAPP, in Amendment 2 and Amendment 4; (3) elimination of SRT rates applicable to smaller train sizes in Amendment 2; (4) addition of a new minimum volume requirement from NAPP origins in Amendment 3; (5) removal of the minimum volume requirement for Cape Fear and Lee plants in Amendment 3; and (6) increase of the minimum volume commitment to Duke's plant from 25% to 95% in C-9545. See ECF No. 284, at 1-2. Indeed, Norfolk Southern concedes that allowing such evidence and argument is consistent with the court's July 22, 2019 memorandum opinion that found that "C-9290 may be relied upon to the extent the terms of the amendments only form the basis of Drummond's claims." ECF No. 267, at 47 n.8. The court concurs that to the extent Amendments 2, 3, and 4 contain obligations absent from the original contract, they may be introduced in support of Drummond's material breach claims.

The court further finds, however, that certain language contained in Amendments 2, 3, and 4 compels a finding that Drummond may rely upon these same amendments in their entirety, rather than on just those terms which do not mirror terms in the original contract. The following provisions in Amendments 2, 3, and 4, broadly deleting and replacing Article 13 and Article 26, portions of which Norfolk Southern considers "original terms" barred by the release, draws these amendments in their entirety outside the scope of the mutual release:

> **Amendment 2**
>
> Article 13 of the Contract, Base Rates, is hereby deleted in its entirety and replaced . . .
>
> **Amendment 3**

> Article 26 of the Contract, Minimum Volume and Liquidated Damages, is hereby deleted in its entirety and replaced . . .
>
> **Amendment 4**
>
> Article 13, Base Rates, is hereby replaced in its entirety with the following for shipments occurring on or after January 1, 2014 . . .

The court need not go beyond the plain wording of the above prefatory provisions to hold that amendments are not merely restating or republishing terms of an earlier contract as alleged by Norfolk Southern. Under accepted canons of contract interpretation, the only fair reading of the above provisions is as displacing, wholesale, the preexisting obligations under Article 13 and Article 26 under C-9290 through the substitution of modified versions of these same articles. While some of the terms remained the same, the above provisions signify that the original terms of Article 13 and Article 26, in their entirety, are no longer operative. Indeed, the inclusion of full force and effect clauses in all three amendments stating, "Except as herein amended . . . ," all other provisions of C-9337 remain in effect, by negative implication, underscores that those provisions which were deleted in their entirety and/or replaced, i.e., "amended" are legally distinct from the original contract inasmuch as they became operative after the execution of the mutual release, and therefore fall outside its scope.[6]

---

[6] This finding comports with the court's prior holding in Norfolk S. Ry. Co. v. Drummond Coal Sales, Inc., 2016 U.S. Dist. LEXIS 115485 20-21 (W.D. Va. 2016), wherein the court excluded Count One of Drummond's Alabama complaint. In that case, Count One sought a declaration that the Amended Contract was void because Norfolk Southern enjoyed either monopolistic or oligopolistic bargaining power with respect to the destinations covered in the agreement. Id. at *19. Drummond specifically complained of the "Cancellation" provision that gave Norfolk Southern sole discretion to cease service to all contract destinations at any time, as well as the "double dipping" provisions that provided for both rate escalation and fuel surcharges. Id. The court held that although Count One referenced the "Amended Contract," as amended by "Amendment Number 1 to the Transportation Contract NS-9337," the terms at issue in Count One were not those that were amended by Amendment Number 1, namely Article 3, Article 20(a), (b) and (c), Article 27(e)(1), (2) and (3), Article 27(g), and Article 29. Here, by contrast, Article 13 and Article 26 are the explicit subject of Amendments 2, 3, and 4. In other words, the terms at issue here concern provisions that were amended or added after January 2010.

13

In sum, Drummond may rely upon the rates contained in Amendments 2 and 4, the minimum volume commitments at issue in Amendment 3, as well as those other contractual provisions Norfolk Southern concedes were not part of the original contract. Drummond may also introduce evidence and/or argument related to the non-existence of a rate from the SRT to Asheville.

It is **SO ORDERED**.

Entered: 09/04/2019

/s/ Michael F. Urbanski

Michael F. Urbanski
Chief United States District Judge